

# Notice of Service of Process

**TMM / ALL**
**Transmittal Number: 30210410**
**Date Processed: 11/05/2024**

| | |
|---|---|
| **Primary Contact:** | Anne Herthneck<br>Sysco Corporation<br>1370 Enclave Pkwy<br>Bldg A<br>Houston, TX 77077-2025 |
| **Electronic copy provided to:** | Meredith Leitner<br>Dawn Becker<br>Eve McFadden<br>Leslie Medina |

| | |
|---|---|
| **Entity:** | Sysco Corporation<br>Entity ID Number  3338951 |
| **Entity Served:** | Sysco Corporation |
| **Title of Action:** | Performance Food Group, Inc. vs. Sysco Corporation |
| **Matter Name/ID:** | Performance Food Group, Inc. vs. Sysco Corporation (16476456) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Others |
| **Court/Agency:** | Denver County District Court, CO |
| **Case/Reference No:** | 2024CV33128 |
| **Jurisdiction Served:** | Colorado |
| **Date Served on CSC:** | 11/04/2024 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Williams Weese Pepple & Ferguson PC<br>303-861-2828 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>October 15, 2024 1:29 PM<br>FILING ID: 2044CFB73DA45<br>CASE NUMBER: 2024CV33128 |
| **Plaintiff:**<br><br>PERFORMANCE FOOD GROUP, INC. and WILLIAM MIKULKA<br>v.<br><br>**Defendants:**<br><br>SYSCO CORPORATION, SYSCO DENVER, INC., SYSCO NEW MEXICO USA, and SYSCO USA I, INC. | ♦ COURT USE ONLY ♦ |
| ***Attorneys for Plaintiffs Performance Food Group, Inc. and William Mikulka***<br><br>Charles W. Weese, No. 32912<br>Jessica P. Marsh, No. 53473<br>WILLIAMS WEESE PEPPLE & FERGUSON PC<br>1801 California Street, Suite 3400<br>Denver, Colorado 80202<br>Telephone: (303) 861-2828<br>cweese@williamsweese.com<br>jmarsh@williamsweese.com<br><br>Yasser A. Madriz*<br>Meghaan C. Madriz*<br>Miles O. Indest*<br>Sarah Holub*<br>MCGUIREWOODS LLP<br>845 Texas Avenue, Suite 2400<br>Houston, Texas 77002<br>Telephone: (832) 255-6361<br>ymadriz@mcguirewoods.com<br>mmadriz@mcguirewoods.com<br>mindest@mcguirewoods.com<br>sholub@mcguirewoods.com<br>*(pro hac vice application forthcoming) | Case No.  2024CV033128<br><br>Division/Courtroom: 424 |

**EXHIBITS TO COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Performance Food Group, Inc. ("PFG") and William Mikulka ("Mikulka") (collectively, "Plaintiffs") submit Exhibits 1-4 to the Complaint for Declaratory and Injunctive Relief filed with the Court on October 11, 2024, Filing ID 24555457265A1.

Dated:  October 15, 2024

Respectfully submitted,

*/s/ Charles W. Weese*

Charles W. Weese (No. 32912)
Jessica P. Marsh (No. 53473)
WILLIAMS WEESE PEPPLE & FERGUSON PC

Yasser A. Madriz*
Meghaan C. Madriz*
Miles O. Indest*
Sarah Holub*
MCGUIREWOODS LLP
*(*pro hac vice application forthcoming*)

**ATTORNEYS FOR PLAINTIFFS**
**PERFORMANCE FOOD GROUP, INC.**
**AND WILLIAM MIKULKA**

2

DATE FILED
October 15, 2024 1:29 PM
FILING ID: 2044CFB73DA45
CASE NUMBER: 2024CV33128

# EXHIBIT 1

## Sysco Protective Covenants Agreement

This Sysco Protective Covenants Agreement (**"Agreement"**) is between the acknowledging Associate (**"Associate"**) and Sysco Corporation, collectively referred to as the **"parties."**

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Company or any affiliate or subsidiary of Company (collectively referred to herein as **"Company"**), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

## SECTION 1.  Benefits and Responsibilities of Employment.

**1.1    Position of Trust.**  By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company.  Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company or an affiliate of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with Associates; and that Associate's use of such Confidential Information, customer and vendor goodwill, or Associate relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole.  Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

**1.2    Duty of Loyalty and Conflicts of Interest.**  During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company.  Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate would otherwise have to Company through common law or statute.

**SECTION 2.  Confidentiality and Business Interests**.

    **2.1**    **Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement. Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

    **2.2**    **Definition of Trade Secrets.** The term "Trade Secret" is defined herein to include information, without regard to form, including, but not limited to, technical or nontechnical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential customers or suppliers which are not commonly known by or available to the public and which information (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Examples of Trade Secrets include computer programs and computer code; charts, statistics, specifications, evaluations; customer lists and records; Business development guidelines, tools, strategies and methods; and management tools and problem-solving techniques.

**2.3** **Unauthorized Use or Disclosure.** Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information or Trade Secrets (as defined above), or knowingly use Confidential Information or Trade Secrets to harm or compromise the interests of Company.  The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as a Trade Secret or Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information or Trade Secrets in any manner that is not within the course and scope of employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena).  If Associate believes a disclosure of Confidential Information or Trade Secrets is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure.  However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

**2.4** **Associate Recordkeeping, Computer Use, and Mobile Devices.** (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company.  Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business.  When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets. Associate agrees that the obligation to return property extends to all information and property, not just Confidential Information. (b) Associate agrees not to use Company's computers, servers, email systems, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company.  Where allowed by law,

Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

**2.5    Protected Activities.**  The obligations in Section 2 are intended to maintain the confidentiality of Company's Trade Secrets and Confidential Information, to prevent the use of Company records to assist a Competitor (defined below), and to prohibit unauthorized access to and use of Company computers. Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency. Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the Trade Secret to Associate's attorney and use the Trade Secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the Trade Secret, except pursuant to court order.

**SECTION 3.   Protective Covenants.**  Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's legitimate business interests, Trade Secrets, and Confidential Information. Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Trade Secrets and Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material harm. Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) necessary to protect the Company's Trade Secrets and Confidential Information, and (iii) reasonable and necessary to protect Company's legitimate business interests.

### 3.1.    <u>Definitions Related to Protective Covenants</u>.

(a)    **"Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the **"Look Back Period"**): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) Associate learned confidential information about. A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)    **"Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period (which is presumed to be all products and services of Company during the Look Back Period due to the nature of Associate's position unless Associate can show otherwise by clear and convincing evidence). This includes, without limitation, products and services under development by Company during the Look Back Period. Some examples of conflicting products or services would be the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies during the Look Back Period to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)    **"Competitor"** means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in the same line of business as Company (a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company), including group purchasing organizations.

### 3.2    <u>Restriction on Interfering with Employee Relationships.</u>    Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company. Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

### 3.3    <u>Restriction on Interfering with Customer Relationships.</u>    Associate agrees that for a period of two years following the end of Associate's employment with

Company, Associate will not, in person or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy or refer persons to a Competitor or Conflicting Product or Service. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

**3.4    Restriction on Unfair Competition.** Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not: accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has regularly engaged in business activities for Company in person, by phone, or through correspondence during the Look Back Period and (ii) all states, provinces, counties, or parishes included within any geographical region or market that Associate directly or indirectly managed on behalf of Company. Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information and customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company. This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5    Clarification of Restrictions.** In the event that the meaning of a material portion of a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate understands that the failure to seek such a clarification

may waive Associate's right to later claim confusion over the scope or application of a restriction.

**3.6** **Survival of Restrictions.** (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Company will not assert that Company's doing so constitutes actionable interference or defamation. (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee. (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction. (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7** **Geographic Scope of Restrictions for Louisiana Associates.** To the extent Associate is assigned to an operating company located in the State of Louisiana, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn. The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8** **Scope of Restrictions for Oklahoma Associates.** To the extent Associate is assigned to an operating company located in the State of Oklahoma, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered

Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Oklahoma.

 **3.9** **California Associates.**  This Section 3 does not apply to Associate to the extent Associate works in the State of California.  The foregoing shall in no way limit Associate's restrictions outside the State of California.

**SECTION 4.  Special Remedies**.  If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law.   The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.  Severability, Waiver, Modification, Assignment, Governing Law.**  (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement.  (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.  (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it.  The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order. (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s); and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate. (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum. (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles of any state that may be to the contrary. (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state where Associate last regularly worked for Company.

**SECTION 6**. **Jury Trial Waiver**. The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.** **Resolution for Incumbent Employee.** This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

**7.1. Settlement Purpose.** Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company. Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions. However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties. Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes. Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time or to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.

KPDCM7JD

09/13/2020 09:19 PM U.S. Eastern Standard Time

ACCEPTED

DATE FILED
October 15, 2024 1:29 PM
FILING ID: 2044CFB73DA45
CASE NUMBER: 2024CV33128

# EXHIBIT 2

**Sysco Protective Covenants Agreement**

This Sysco Protective Covenants Agreement (**"Agreement"**) is between the acknowledging Associate (**"Associate"**) and Sysco Corporation, collectively referred to as the **"parties."**

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Company or any affiliate or subsidiary of Company (collectively referred to herein as **"Company"**), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

**SECTION 1.  Benefits and Responsibilities of Employment.**

     **1.1    Position of Trust.**  By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company.  Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company or an affiliate of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with Associates; and that Associate's use of such Confidential Information, customer and vendor goodwill, or Associate relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole.  Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

     **1.2    Duty of Loyalty and Conflicts of Interest.**  During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company.  Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate would otherwise have to Company through common law or statute.

PCA – US & CA (Aug 2021)                    1

**SECTION 2.  Confidentiality and Business Interests**.

     **2.1**   **Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement.  Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

     **2.2**   **Definition of Trade Secrets.**  The term "Trade Secret" is defined herein to include information, without regard to form, including, but not limited to, technical or nontechnical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential customers or suppliers which are not commonly known by or available to the public and which information (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Examples of Trade Secrets include computer programs and computer code; charts, statistics, specifications, evaluations; customer lists and records; Business development guidelines, tools, strategies and methods; and management tools and problem-solving techniques.

**2.3**    **Unauthorized Use or Disclosure.**  Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information or Trade Secrets (as defined above), or knowingly use Confidential Information or Trade Secrets to harm or compromise the interests of Company.  The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as a Trade Secret or Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information or Trade Secrets in any manner that is not within the course and scope of employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena).  If Associate believes a disclosure of Confidential Information or Trade Secrets is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure.  However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

**2.4**    **Associate Recordkeeping, Computer Use, and Mobile Devices.**  (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company.  Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business.  When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets.  Associate agrees that the obligation to return property extends to all information and property, not just Confidential Information.  (b) Associate agrees not to use Company's computers, servers, email systems, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company.  Where allowed by law,

Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

**2.5    Protected Activities.**  The obligations in Section 2 are intended to maintain the confidentiality of Company's Trade Secrets and Confidential Information, to prevent the use of Company records to assist a Competitor (defined below), and to prohibit unauthorized access to and use of Company computers.  Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency.  Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information.  "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the Trade Secret to Associate's attorney and use the Trade Secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the Trade Secret, except pursuant to court order.

**SECTION 3.    Protective Covenants.**  Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's legitimate business interests, Trade Secrets, and Confidential Information.  Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Trade Secrets and Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material harm.  Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) necessary to protect the Company's Trade Secrets and Confidential Information, and (iii) reasonable and necessary to protect Company's legitimate business interests.

### 3.1.  <u>Definitions Related to Protective Covenants.</u>

(a)    "**Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the "**Look Back Period**"): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) Associate learned confidential information about.  A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)    "**Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period (which is presumed to be all products and services of Company during the Look Back Period due to the nature of Associate's position unless Associate can show otherwise by clear and convincing evidence).  This includes, without limitation, products and services under development by Company during the Look Back Period.  Some examples of conflicting products or services would be the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies during the Look Back Period to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)    "**Competitor**" means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in the same line of business as Company (a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company), including group purchasing organizations.

### 3.2  <u>Restriction on Interfering with Employee Relationships.</u>  Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company.  Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

### 3.3  <u>Restriction on Interfering with Customer Relationships.</u>  Associate agrees that for a period of two years following the end of Associate's employment with

Company, Associate will not, in person or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy or refer persons to a Competitor or Conflicting Product or Service. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

**3.4    Restriction on Unfair Competition.** Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not: accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has regularly engaged in business activities for Company in person, by phone, or through correspondence during the Look Back Period and (ii) all states, provinces, counties, or parishes included within any geographical region or market that Associate directly or indirectly managed on behalf of Company. Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information and customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company. This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5    Clarification of Restrictions.** In the event that the meaning of a material portion of a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate understands that the failure to seek such a clarification

may waive Associate's right to later claim confusion over the scope or application of a restriction.

**3.6**   **Survival of Restrictions.**   (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Associate will not assert that Company's doing so constitutes actionable interference or defamation.   (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee.  (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction.  (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7**   **Geographic Scope of Restrictions for Louisiana Associates.**   To the extent Associate is assigned to an operating company located in the State of Louisiana, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8**   **Scope of Restrictions for Oklahoma Associates.**   To the extent Associate is assigned to an operating company located in the State of Oklahoma, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered

Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Oklahoma.

   **3.9** **California Associates.** This Section 3 does not apply to Associate to the extent Associate works in the State of California.   The foregoing shall in no way limit Associate's restrictions outside the State of California.

**SECTION 4.** **Special Remedies**. If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law.   The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.** **Severability, Waiver, Modification, Assignment, Governing Law.** (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement.   (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.   (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it.   The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order. (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s); and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate. (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum. (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles that may be to the contrary. (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state or province where Associate last regularly worked for Company.

**SECTION 6**.  **Jury Trial Waiver**.    The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.    Resolution for Incumbent Employee.**  This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

    **7.1.  Settlement Purpose.**    Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company.  Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions.    However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties.    Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes.    Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time.  If Associate is working in the United States, nothing in this Agreement will be construed to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.

LPJAUEMT

09/19/2021 06:21 PM U.S. Eastern Standard Time

ACCEPTED

DATE FILED
October 15, 2024 1:29 PM
FILING ID: 2044CFB73DA45
CASE NUMBER: 2024CV33128

# EXHIBIT 3

## Sysco Protective Covenants Agreement

This Sysco Protective Covenants Agreement ("**Agreement**") is between the acknowledging Associate ("**Associate**") and Sysco Corporation, collectively referred to as the "**parties.**"

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Sysco Corporation or any affiliate or subsidiary of Sysco Corporation (collectively referred to herein as "**Company**"), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

## SECTION 1.  Benefits and Responsibilities of Employment.

**1.1    Position of Trust.**  By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company.  Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with other employees of Company; and that Associate's use of such Confidential Information, customer and vendor goodwill, or employee relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole.  Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

**1.2    Duty of Loyalty and Conflicts of Interest.**  During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company, and Associate agrees to not engage in such conduct.  Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate otherwise owes to Company through common law or statute.

**SECTION 2.  Confidentiality and Business Interests**.

**2.1    Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical or nontechnical data, know-how, innovations, computer programs or code, formulae, patterns, compilations, devices, drawings, processes, financial plans, product plans, supplier lists and records, charts, statistics, specifications, evaluations, business development guidelines, management tools and problem-solving techniques, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence.  Confidential Information includes trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement.  Company's confidential exchange of information with a third party will not remove it from protection under this Agreement.  Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets.  Associate acknowledges and agrees that Company owns the Confidential Information. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection. Confidential information also includes all such information described in this Section that relates to the business of any parent, affiliate, or subsidiary of Company.

**2.2    Unauthorized Use or Disclosure**. Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information (as defined above), or knowingly use Confidential Information to harm or compromise the interests of Company. The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information in any manner that is not within the course and scope of

employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena). Except as otherwise provided by Section 2.4 of this Agreement, if Associate believes a disclosure of Confidential Information is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure. However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

    **2.3**   **Associate Recordkeeping, Computer Use, and Mobile Devices.** (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company. Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business. Associate shall not at any time remove, copy, download, or transmit any information from the Company, except for the benefit of the Company and in accordance with this Agreement and the Company's policies. When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets. Associate agrees that the obligation to return property extends to all Company information and property, not just Confidential Information. (b) Associate agrees not to use Company's computers, servers, email systems, mobile devices, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company. Where allowed by law, Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

    **2.4**   **Protected Activities.** Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of

information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency. Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

For the sake of clarity, and not limitation, Associate's obligations relating to Confidential Information shall not preclude or prevent Associate from making disclosures that are protected by law, including, but not limited to, any disclosures relating to conduct that Associate reasonably believe to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the trade secret to Associate's attorney and use the trade secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

**SECTION 3.  Protective Covenants.**  Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's Confidential Information, trade secrets, and other legitimate business interests. Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material and irreparable harm. Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) supported by good and valuable consideration, including but not limited to the consideration identified in Section 1.1 of the Agreement, which Associate would not be entitled to receive unless Associate agreed to these covenants; (iii) necessary to

protect the Company's Confidential Information, and (iv) reasonable and necessary to protect Company's legitimate business interests.

### 3.1.    Definitions Related to Protective Covenants.

(a)    "**Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the "**Look Back Period**"): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) Associate learned Confidential Information about. A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)    "**Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period. This includes, without limitation, products and services under development by Company during the Look Back Period. Examples of conflicting products or services include, without limitation, the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)    "**Competitor**" means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company, including but not limited to group purchasing organizations.

### 3.2    Restriction on Interfering with Employee Relationships.    Associate agrees that during Associate's employment with Company and for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company. Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

### 3.3    Restriction on Interfering with Customer Relationships.    Associate agrees that during Associate's employment with Company and for a period of two years

following the end of Associate's employment with Company, Associate will not, directly or indirectly, personally or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy a Conflicting Product or Service from or otherwise refer a Covered Customer to a Competitor. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

3.4    **Restriction on Unfair Competition.**    Associate agrees that during Associate's employment with Company and for a period of two years following the end of Associate's employment with Company, Associate will not: accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has engaged in material business activities for Company in person, by phone or other remote means, or through correspondence during the Look Back Period; (ii) all states, provinces, counties, boroughs, or parishes included within any geographical region or market that Associate directly or indirectly serviced or managed on behalf of Company during the Look Back Period;(iii) any state, county, borough, parish or other geographic region as to which Associate had access to Confidential Information during the Look Back Period; and (iv) any state, county, borough, parish or other geographic region in which the Associate's Business Unit conducted business during the Look Back Period. "**Business Unit**" means the business segment which Company was a part of during the Look Back Period (whether U.S. and Canada Foodservice Operations, International Foodservice Operations, SYGMA, FreshPoint, Specialty Meat and Seafood, Guest Worldwide, Greco & Sons and/or the Global Support Center). Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information, and supplier and/or customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company. This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5** **Clarification of Restrictions.** In the event that the meaning of a material portion of a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate agrees that the failure to seek such a clarification waives Associate's right to later claim confusion over the scope or application of a restriction.

**3.6** **Survival of Restrictions.** (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Associate will not assert that Company's doing so constitutes actionable interference, defamation, or other actionable conduct. (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee. (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction. (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7** **Louisiana Associates.** To the extent Associate works for the Company in the State of Louisiana (or last worked for the Company in the State of Louisiana, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist,

St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8    Oklahoma Associates.** To the extent Associate works for the Company in the State of Oklahoma (or last worked for the Company in the State of Oklahoma, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma.

**3.9    California Associates.** This Section 3 and Sections 5(e), 5(f), and 5(g) do not apply to Associate to the extent Associate works for the Company in the State of California (or last worked for the Company in the State of California, if Associate is no longer employed by the Company) at the relevant time of enforcement.

**3.10    Illinois Associates.** To the extent Associate works for the Company in the State of Illinois (or last worked for the Company in the State of Illinois, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate acknowledges and represents that the Company has provided Associate a copy of this Agreement at least fourteen (14) calendar days prior to Associate's start of employment with the Company, or at least fourteen (14) calendar days to review the Agreement. Associate acknowledges they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily. The Company advises Associate to consult with an attorney before entering into this Agreement.

**3.11    Washington Associates.** To the extent Associate works for the Company in the State of Washington (or last worked for the Company in the State of Washington, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that notwithstanding the provisions set forth elsewhere in this Agreement:

(a)    To the extent Associate makes $107,301.04 or less per year in earnings from the Company:

(1)    the obligations and restrictions set forth in Sections 1.2, 3.2, 3.3, and 3.4 of this Agreement that apply during Associate's employment shall only apply to Associate to the extent such obligations and restrictions are commensurate and coextensive with Associate's duty of loyalty, duty to avoid conflicts of interest, and statutory duties.

(2)    that aside from: (A) the post-employment restriction prohibiting Associate from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company, and (B) the post-employment restriction prohibiting Associate from directly or indirectly soliciting the Company's employees to terminate their relationship with the Company (collectively, the "Non-Solicitation Covenants"), which restrictions remain in full force and effect and are unaffected by this paragraph; the remainder of the post-employment restrictions set forth in Sections 3.2, 3.3, and 3.4 of this Agreement (collectively, the "Non-Competition Covenants") shall not apply to Associate. For purposes of construing the Non-Solicitation Covenants, the term "Company" shall have the same meaning as the term "employer" in RCW 49.62.010(5) and the term "customer" shall have the same meaning as the term "customer" in RCW 49.62.010(5).

(b)    That even if Associate makes more than $107,301.04 per year in earnings from the Company, and aside from the Non-Solicitation Covenants, which are unaffected by this paragraph, the post-employment provisions of the Non-Competition Covenants shall (1) only apply for 18 months after Associate's employment with Company ends, and (2) not apply to Associate following Associate's separation from the Company if Associate is terminated by the Company as the result of a layoff, unless the Company, at its sole option, pays Associate compensation equivalent to Associate's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Associate through subsequent employment during that period.

(c)    Nothing in this Agreement is intended to or shall impair any rights Associate has under Chapter 49.62. RCW.

(d)    The $107,301.04 figure referenced throughout this Section is calculated as of the earlier of the date of the Company's enforcement of any restrictive provisions or the date of Associate's separation from employment with the Company. In addition, this $107,301.04 figure is current through December 31, 2022, but is subject to annual adjustment for inflation as specified in RCW 49.62.040 (or any successor statute).

(e)    To the extent Associate was already employed by the Company at the time Associate entered into this Agreement, Associate was provided independent consideration to enter into this Agreement.

(f)    Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Section 3.4 of this Agreement.

**3.12. <u>Oregon Associates.</u>** To the extent Associate works for the Company in the State of Oregon (or last worked for the Company in the State of Oregon, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that Associate will forfeit any amount of any equity award that has not yet vested as of the first date of violation if Associate violates any of Section 3.2, 3.3, or 3.4 of this Agreement, and that, except for purposes of such forfeiture, (a) the term "Company" for

purposes of Sections 3.2 and 3.3 of this Agreement is limited to the Company-affiliated entity that employs Associate or last employed Associate, (b) the term "Covered Customer" for purposes of Section 3.3 is limited to established customers of the Company, (c) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends, and (d) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply to an Associate who (i) receives a written employment offer at least two weeks before their first day of employment which expressly states that entering into a noncompetition agreement is a condition of employment, or is a current employee who entered into this Agreement as part of a bona fide job advancement, and (ii) is either (A) exempt from overtime pay as a professional, administrative or executive employee, and earns at termination the threshold compensation required by Oregon Revised Statute 653.295(1)(e); or (B) provided (at the Company's sole and absolute discretion) compensation during the post-employment restriction period in which Associate is restricted from working at or above the level designated by Oregon Revised Statute 653.295(7).

**3.13.** **Massachusetts Associates.**    To the extent Associate works for the Company in the Commonwealth of Massachusetts (or last worked for the Company in the Commonwealth of Massachusetts, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Associate agrees that the post-employment restrictions set forth in Section 3.4 of this Agreement only apply if Associate is provided (at the Company's sole and absolute discretion) compensation during the post-employment restriction period in which Associate is restricted from working at or above the level designated by Mass. Gen. Laws 24L(b)(vii); (b) the Company hereby advises Associate to consult with an attorney before entering into this Agreement, (c) the parties agree that the forum and venue for any legal action arising from this Agreement shall be in Suffolk County, Massachusetts, notwithstanding any other provision herein, (d) if Associate is entering into this Agreement in connection with commencement of employment with the Company, Associate acknowledges and represents that the Company has provided Associate a copy of this Agreement by the earlier of Associate's formal offer of employment or ten (10) business days before the commencement of Associate's employment, (e) if Associate is entering into this Agreement after commencement of employment with the Company, Associate acknowledges they have ten (10) business days to review the Agreement, and that Associate may sign the Agreement prior to the expiration of those ten (10) business days, and in so doing, Associate represents that they do so voluntarily, and (f) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends, unless Associate has breached Associate's fiduciary duty to Company or has unlawfully taken, physically or electronically, property belonging to Company, in which case the post-employment restrictions set forth in Section 3.4 of this Agreement shall apply for 2 years after Associate's employment with Company ends.

**3.14.** **Maine Associates.** To the extent Associate works for the Company in the State of Maine (or last worked for the Company in the State of Maine, if Associate is no

longer employed by the Company) at the relevant time of enforcement, (a) the post-employment restrictions set forth in Section 3.4 of this Agreement shall not apply unless Associate earns wages from the Company above 400% of the federal poverty level during Associate's employment, (b) the post-employment restrictions set forth in Section 3.4 of this Agreement do not take effect until the later of (i) one year of Associate's employment with the Company or (ii) six (6) months after the date Associate signs the Agreement, and (c) Associate has at least three (3) business days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those three (3) business days, and in so doing, Associate represents that they do so voluntarily.

**3.15.** **Nevada Associates.** To the extent Associate works for the Company in the State of Nevada (or last worked for the Company in the State of Nevada, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) the post-employment restrictions set forth in Section 3.4 of this Agreement do not apply if Associate is paid by the Company solely on an hourly wage basis, exclusive of any tips or gratuities; and (b) Associate's post-employment restrictions in Sections 3.3 and 3.4 of this Agreement do not prevent Associate from providing services to a former customer or client if all of the following conditions are met: (i) Associate did not solicit the former customer or client; (ii) the customer or client voluntarily chose to leave the Company and seek services from the Associate; and (iii) Associate is otherwise complying with the limitations in the covenants in Sections 3.3 and 3.4 of this Agreement as to time, geographical area and scope of activity to be restrained, other than any limitation on providing services to a former customer or client who seeks the services of Associate without any contact instigated by Associate.

**3.16.** **Virginia Associates.** To the extent Associate works for the Company in the Commonwealth of Virginia (or last worked for the Company in the Commonwealth of Virginia, if Associate is no longer employed by the Company) at the relevant time of enforcement, the post-employment restrictions set forth in Sections 3.2, 3.3, and 3.4 of this Agreement do not apply if Associate is a "low-wage employee" as defined by Virginia Code 40.1-28.7:8(A).

**3.17** **Colorado Associates.** To the extent Associate works for the Company in the State of Colorado (or last worked for the Company in the State of Colorado, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Section 3.3 only applies if Associate earns at least 60% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (b) Section 3.4 only applies if Associate earns at least 100% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (c) Associate has at least fourteen (14) days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily; and

(d) Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Sections 3.3 or 3.4 of this Agreement.

**3.18    Utah Associates.**  To the extent Associate works for the Company in the State of Utah (or last worked for the Company in the State of Utah, if Associate is no longer employed by the Company) at the relevant time of enforcement, the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends.

**SECTION 4.  Special Remedies.**  If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law.   The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.  Severability, Waiver, Modification, Assignment, Governing Law.**  (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement.  (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.  (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it.  The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order. (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s), each of which are third-party beneficiaries of this Agreement; and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate.  (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum.  (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles that may be to the contrary.  (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state or province where Associate last regularly worked for Company.

PCA – US & CA (August 2022) (R)                                                                                        12

**SECTION 6.** **Jury Trial Waiver.** The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.** **Resolution for Incumbent Employee.** This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

    **7.1.** **Settlement Purpose.** Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company. Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions. However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties. Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes. Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time. If Associate is working in the United States, nothing in this Agreement will be construed to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.

**MRV94EW3**

**10/03/2022 03:32 PM U.S. Eastern Standard Time**

**ACCEPTED**

DATE FILED
October 15, 2024 1:29 PM
FILING ID: 2044CFB73DA45
CASE NUMBER: 2024CV33128

# EXHIBIT 4

 Performance Food Group

October 9, 2024

Bill Mikulka
8287 Whisper Wood Court
Parker, CO 80134

Dear Bill:

It is my pleasure to offer you the position of President, Regional - West reporting to me.

I am pleased to offer you the following:

| | |
|---|---|
| Title: | President, Regional - West |
| Reporting to: | Steve Broad, EVP, PFS Field |
| Start Date: | October 13, 2024 |
| Base Salary: | The equivalent of ▮▮▮ per year, or ▮▮▮ per pay period, as we have twenty-six (26) pay periods. |
| Signing Bonus: | The Company will pay you a ▮▮▮ signing bonus within 30 days of your start date. |
| Bonus: | Your FY25 bonus opportunity will be 100% of your base salary and will not be prorated. It will be administered based upon the guidelines in the Company's Annual Incentive Plan. Further details of the incentive plan will be provided to you under separate cover. PFG's Annual Incentive Plan will be reviewed periodically and may be subject to change at any time without notice. |
| Long Term Incentive Plan: | You will be eligible to participate in the LTIP at 40% of your base salary on the established schedule, and it will be prorated based on your time in the position. The LTIP grants are currently expected to occur annually at the Board of Directors' meeting following the end of the fiscal year. Details of the LTIP will be provided in a separate document. PFG's LTIP will be reviewed periodically and may be subject to change at any time without notice. |
| Benefits: | You will be eligible to participate in the Company's group health and wellness programs, the 401(k), our ESPP, and any other group plan offered by the Company to its associates. In addition, you will be eligible for additional benefits commensurate with your position. Please note that should you elect to participate in the Deferred Compensation Plan, you must enroll within thirty (30) days of becoming eligible.

The Company's benefit plans are subject to change, amendment, or elimination at any time at the discretion of the Company. |
| Paid Time-Off: | You will be eligible for paid time off – vacation, holidays, sick leave. The Company recognizes our dedicated senior leaders work in the best interests of our customers, associates, and the Company, and we offer you our flexible vacation program, in which paid vacation time is not limited, allocated, accrued or earned. This program gives you the flexibility to determine how much vacation time to request and use, while balancing your work responsibilities and business needs. You will also be eligible for paid holidays. The Company observes six (6) major holidays – New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day – and you will receive up to four (4) personal holidays, which are pro-rated and granted based upon hire date. In addition to paid vacation and holidays, you will also be eligible for up to 48 hours per year of paid sick time in accordance with our Colorado sick leave policy. |

**At-Will Status:** Should you accept this offer, you will be employed "at-will," which means you or the Company may terminate your employment at any time with or without cause, and with or without notice. Should such a separation occur, all wages and other company benefits and grants not vested shall cease as of the day of separation, except as otherwise provided by applicable law or plan document. Your at-will employment status cannot be changed, except in a written document signed by you and the Chief Human Resources Officer.

**No Inconsistent Obligations:** You hereby represent, warrant, and agree that: (i) you will not bring any confidential, proprietary, trade secret, or non-public information belonging to any other entity or person to your employment with the Company; (ii) you have not provided, and will not provide in the future, any confidential, proprietary, trade secret, or non-public information belonging to any other entity or person to the Company (except as authorized by such entity or person); (iii) you will not bring any equipment, information, documents, or other materials in any form (electronic or paper) from any prior employer to the Company, give such materials to any employee, contractor, or representative of the Company, or use such materials in your employment with the Company; and (iv) you will not use, disclose, share, disseminate, or rely upon any confidential, proprietary, trade secret, or non-public information of any prior employer, or any other entity or person (except as authorized by such entity or person), in your employment with the Company.

This offer is contingent upon your acceptance of its terms and your successful completion of the pre-employment drug test and background check.

This letter is not a contract of employment for a specific period of time, and it supersedes all written or oral communications concerning your potential employment with the Company.

If you agree with the terms and conditions set forth in this offer letter, please indicate your acceptance by signing the Acknowledgment and Acceptance Letter and returning the original to me.

Should you have any questions, please do not hesitate to contact me at (254) 774-2095.

Sincerely,

Steve Broad
EVP, PFS Field
Performance Food Group



**ACKNOWLEDGEMENT AND ACCEPTANCE
OF
OFFER LETTER FOR EMPLOYMENT**

I, Bill Mikulka, hereby acknowledge acceptance of the employment offer as outlined in the attached offer letter dated October 9, 2024, for the position of President, Regional – West and accept employment under the terms and conditions set therein.

_Bill Mikull_                     _10/9/2024_

Bill Mikulka                     Date

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>October 11, 2024 12:24 PM<br>FILING ID: 24555457265A1<br>CASE NUMBER: 2024CV33128 |
| **Plaintiff:**<br><br>PERFORMANCE FOOD GROUP, INC. and WILLIAM MIKULKA<br>v.<br><br>**Defendants**:<br><br>SYSCO CORPORATION, SYSCO DENVER, INC., SYSCO NEW MEXICO USA, and SYSCO USA I, INC. | ↑ **COURT USE ONLY** ↑ |
| *Attorneys for Plaintiffs Performance Food Group, Inc. and William Mikulka*<br><br>Charles W. Weese, No. 32912<br>Jessica P. Marsh, No. 53473<br>WILLIAMS WEESE PEPPLE & FERGUSON PC<br>1801 California Street, Suite 3400<br>Denver, Colorado 80202<br>Telephone: (303) 861-2828<br>cweese@williamsweese.com<br>jmarsh@williamsweese.com<br><br>Yasser A. Madriz*<br>Meghaan C. Madriz*<br>Miles O. Indest*<br>Sarah Holub*<br>MCGUIREWOODS LLP<br>845 Texas Avenue, Suite 2400<br>Houston, Texas 77002<br>Telephone: (832) 255-6361<br>ymadriz@mcguirewoods.com<br>mmadriz@mcguirewoods.com<br>mindest@mcguirewoods.com<br>sholub@mcguirewoods.com<br>*(pro hac vice application forthcoming)* | Case No. _____<br><br><br>Division/Courtroom: \_\_\_\_\_ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Performance Food Group, Inc. ("PFG") and William Mikulka ("Mikulka") (collectively, "Plaintiffs") bring this declaratory judgment action against Defendants Sysco Corporation ("Sysco"), Sysco Denver, Inc. ("Sysco Denver"), Sysco New Mexico, LLC ("Sysco New Mexico") and Sysco USA I, Inc. (collectively, "Defendants") and respectfully seek a declaration that certain restrictive covenants are unlawful and unenforceable under Colorado Revised Statutes § 8-2-113 and other controlling Colorado authority or law.

## INTRODUCTION

1.     Pursuant to Colorado Revised Statutes § 8-2-113(7) and Colorado Rule of Civil Procedure 57, Plaintiffs seek a declaratory judgment finding that the non-compete and non-solicitation covenants found in the operative Sysco Protective Covenants Agreement entered into between Mikulka and Defendants on October 3, 2022[1] (the "Agreement") are void or otherwise unenforceable under applicable Colorado law.

2.     On July 10, 2023, Defendants terminated Mikulka, who was serving as Region President of the Southern Rockies, which encompasses Sysco Denver and Sysco New Mexico, without cause. More than a year later, Mikulka accepted an offer of employment to work for PFG. Mikulka's official start date with PFG is set for October 13, 2024. Plaintiffs now seek a declaration that the non-compete and non-solicitation provisions in the Agreement that Defendants drafted, imposed on, and intends to enforce against Mikulka are unlawful restrictive covenants that are void under Colorado Revised Statutes § 8-2-113.

---

[1] As discussed herein, Mikulka accepted various Sysco Protective Covenants Agreements during his employment with Defendants; however, Plaintiffs maintain that the last accepted Sysco Protective Covenants Agreement by Mikulka—*i.e.*, the "Agreement" as defined herein—superseded all prior versions and, thus, is the only operative agreement between Mikulka and Defendants.

2

3.      Generally, Colorado Revised Statutes § 8-2-113 provides that "any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void." Further, even where the limited exceptions outlined in § 8-2-113 apply, a restrictive covenant is nonetheless found to be void where the employer fails to provide the requisite notice of such covenants as set forth in the applicable version of the statute. *See* COLO. REV. STAT. ANN. § 8-2-113(4). Finally, a restrictive covenant will nonetheless be found unenforceable when it is unreasonable in scope.

4.      Because (i) the non-compete and non-solicitation covenants in the Agreement do not fall within the limited exceptions to the general statutory prohibition on restrictive covenants, (ii) Defendants failed to provide the requisite notice of such covenants under the Colorado statute, and (iii) the restrictive covenants are not reasonable in scope or geographic limitation, Plaintiffs respectfully request that this Court: (1) declare that, pursuant to Colorado Revised Statutes § 8-2-113, the restrictive covenants in the Agreement are unlawful, invalid, void, and unenforceable; and (2) enjoin Defendants from using, enforcing, or attempting to enforce those restrictive covenants against Mikulka (whether in his employment with PFG or otherwise).

## PARTIES

5.      PFG is a Colorado corporation with its principal place of business and corporate headquarters in Richmond, Virginia.

6.      Mikulka is an individual presently residing in Douglas County, Colorado.

7.      Sysco is a Delaware corporation with its principal place of business located in Houston, Texas. Sysco is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies

3

and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout Colorado. It may be served through its registered agent, Corporation Service Company, at 1900 W. Littleton Boulevard, Littleton, CO 80120.

8.      Sysco Denver is a Colorado corporation with its principal place of business located in Denver, Colorado. Sysco Denver is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout Colorado. It may be served through its registered agent, Capitol Corporate Services, Inc., at 36 South 18th Ave., Ste. D, Brighton, CO 80601.

9.      Sysco New Mexico is a Delaware corporation with its principal place of business located in Albuquerque, NM. On information and belief, Sysco New Mexico regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants. It may be served through its registered agent, Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, NM 87501.

10.     Sysco USA I, Inc. is a Delaware corporation with its principal place of business located in Houston, Texas. Sysco USA I, Inc. is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout

Colorado. It may be served through its registered agent, Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter pursuant to Colorado Revised Statutes § 8-2-113(7), which states that "[a] worker who is a party to a covenant not to compete, or a subsequent employer that has hired or is considering hiring the worker, may seek a declaratory judgment from a court of competent jurisdiction or an arbitrator that the covenant not to compete is unenforceable." Under Colorado law, "[d]istrict . . . courts within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.R.C.P. 57; *see also* COLO. CONST. ART. VI, § 9 ("The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil . . . . cases.").

12.    This Court may exercise jurisdiction over Defendants because this action arises from Defendants' transaction of business within Colorado. *See* COLO. REV. STAT. ANN. § 13-1-124(1)(a).

13.    This Court is the proper venue to try this action because it is the Court embracing the county in which Sysco Denver resides and the county in which Defendants may be found in this state.[2] *See* C.R.C.P. 98(c)(1).

---

[2] According to documents on file with the Colorado Secretary of State ("SOS"), Sysco Denver maintains its principal office at 5000 Beeler Street, Denver, CO 80238. However, to the extent Sysco Denver was merged into and changed its name to Sysco USA I, Inc., as indicated by the documents on file with the Colorado SOS, then Sysco USA I, Inc. is a nonresident of Colorado—as a Delaware corporation with its principal place of business in Houston, Texas—but can be found at its operational facilities located at 5000 Beeler Street, Denver, CO 80238.

## FACTS

### A. Mikulka's Role with Defendants.

14.     Defendants consider themselves to be the "global leader" in selling, marketing, and distributing food products to restaurants, healthcare and educational facilities, lodging establishments, and other customers, as well as providing equipment and supplies for the food service and hospitality industries.[3] Defendants' network consists of more than 76,000 colleagues, 340 distribution facilities worldwide, and approximately 730,000 customer locations served. On their website, Defendants boast more than $78 billion of sales generated for the fiscal year 2024.

15.     Mikulka became an employee of one or more of Defendants in April of 2014. Defendants initially hired Mikulka as a Senior Vice President of Operations for Sysco in Chicago, Illinois. He was next promoted to Executive Vice President in Seattle, Washington and then President of Sysco Las Vegas.

16.     Then, in July 2016, Defendants moved Mikulka to President of Sysco Denver, and Mikulka relocated his entire family to Colorado.

17.     In September of 2020, Defendants consolidated its operating companies, leading to a major reduction in force among operating company presidents. Mikulka survived this reorganization and took over as Region President of the Southern Rockies, overseeing both Sysco Denver and Sysco New Mexico.

18.     During his tenure as Region President of the Southern Rockies, Mikulka's geographic territory of responsibility encompassed portions of Colorado[4], all of New Mexico, and

---

[3] *See* https://www.sysco.com/about/company-profile/our-purpose (last visited October 10, 2024).
[4] Mikulka's Colorado territory did not include the Western Slope, Grand Junction, Western Colorado, and parts of Southwest Colorado.

portions of West Texas. Mikulka oversaw two distribution centers—one in Denver, Colorado and one in Albuquerque, New Mexico—both of which were within Defendants' broadline[5] business. Mikulka also was generally responsible for sales and operations, profit and loss reporting and accountability, finances and, to a degree, human resources for his territory.

**B. Defendants Required Mikulka to Accept Multiple Versions of the SPCA, Each Superseding the Next.**

19.     In connection with his above-described employment with Defendants, and in order to receive certain equity or quasi-equity grants from Defendants during his employment, Mikulka was required to electronically accept the terms of Defendants' Sysco Protective Covenants Agreement ("SPCA(s)"), which were updated and superseded each year with new iterations.

20.     Relevantly, on September 13, 2020, shortly after Mikulka became Region President of the Southern Rockies, Mikulka was required to electronically accept the terms of the August 2020 version of the SPCA. (*See* August 2020 SPCA, attached hereto as <u>Exhibit 1</u>.)[6] Then, on September 17 and 19, 2021, Mikulka electronically accepted the August 2021 version of the SPCA. (*See* August 2021 SPCA, attached hereto as <u>Exhibit 2</u>.)[7] Finally, on September 27, 2022

---

[5] Defendants' broadline operating companies distribute a full line of food products and a wide variety of non-food products to independent and chain restaurant customers, healthcare facilities, and educational facilities. *See* https://www.sysco.com/about/company-profile/the-sysco-story (last visited October 10, 2024).

[6] Mikulka accepted four separate copies of the August 2020 SPCA in association with various equity grants received from Defendants. The four copies were all executed on September 13, 2020 within minutes of each other and substantively identical. Plaintiffs have attached as an exhibit to this Complaint only one copy for this Court's review but can provide this Court the additional accepted copies if necessary.

[7] Again, Mikulka accepted four separate copies of the August 2021 SPCA in association with various equity grants received from Defendants. Mikulka accepted the August 2021 SPCAs on September 17, 2021 and September 19, 2021, but, again, the copies were substantively identical. Plaintiffs have attached as an exhibit to this Complaint a copy of one of the August 2021 SPCAs accepted on September 19, 2021 but can provide this Court the additional accepted copies if necessary.

and October 3, 2022,[8] Mikulka electronically accepted the operative Agreement: the August 2022

version of the SPCA last accepted by Mikulka on October 3, 2022. (*See* October 3, 2022

Agreement, attached hereto as Exhibit 3.)

21.    The Agreement superseded all prior SPCAs accepted by Mikulka. Specifically,

Section 5 of the Agreement expressly confirmed that it "contains the parties entire agreement

concerning the matters covered in it." (*Id.* at § 5.) Further, Defendants' intention that the

Agreement act as a novation is clear based on the fact that the Agreement covers all the terms of

prior SPCA versions, but endeavors to update the terms therein to comply with recent updates in

the law. Indeed, the Agreement was accepted after amendments to Colorado Revised Statutes § 8-

2-113 became effective on August 10, 2022.

**C. The Amended Colorado Non-Compete Statute Imposed New Requirements for Employers in Colorado.**

22.    Colorado Revised Statutes § 8-2-113, which was amended effective as of August

10, 2022, is Colorado's statute governing, among other topics, the enforcement of non-compete,

customer non-solicitation, and employee confidentiality covenants in the State of Colorado. The

amended statute provides for Colorado's general prohibition of non-compete covenants in the

employment context, by stating: "Except as provided in subsections (2)(b) and (3) of this section,

any covenant not to compete that restricts the right of any person to receive compensation for

performance of labor for any employer is void." COLO. REV. STAT. ANN. § 8-2-113(2)(a). In other

---

[8] Again, Mikulka accepted four substantively identical copies of the August 2022 SPCA in association with various equity grants received from Defendants. As noted above, two copies were accepted on September 27, 2022 and the final two SPCAs were accepted on October 3, 2022. Plaintiffs have attached as an exhibit to this Complaint the last electronically accepted August 2022 SPCA by Mikulka – the Agreement accepted on October 3, 2022. Plaintiffs can provide this Court the additional accepted copies if necessary.

words, apart from the limited exceptions outlined in the statute, non-compete covenants between employers and employees are void under Colorado law.

23.    The enumerated statutory exceptions allow for a non-compete covenant between an employer and employee in Colorado if the employee "earns an amount of annualized cash compensation equivalent to or greater than the threshold amount for highly compensated workers, if the covenant not to compete is for the protection of trade secrets and is no broader than is reasonably necessary to protect the employer's legitimate interest in protecting trade secrets." COLO. REV. STAT. ANN. § 8-2-113(2)(b).

24.    The statutory prohibition against covenants not to compete does not apply to a covenant not to solicit customers governing a person who, at the time the covenant is entered into and at the time it is enforced, earns an amount of annualized cash compensation equivalent to or greater than sixty percent of the threshold amount for highly compensated workers, if the non-solicitation covenant is no broader than reasonably necessary to protect the employer's legitimate interest in protecting trade secrets. COLO. REV. STAT. ANN. § 8-2-113(2)(d). Accordingly, in order for an employer, like Defendants, to enforce a non-compete or customer non-solicitation covenant against a Colorado employee (or former employee) under the amended Colorado statute, the covenants must be designed to protect the employer's trade secrets.

25.    The Colorado statute further provides that a reasonable confidentiality provision is not prohibited by the statute, if certain conditions are met, as follows: (i) it is "relevant to the employer's business;" and (ii) it "does not prohibit disclosure of information that arises from the worker's general training, knowledge, skill, or experience, whether gained on the job or otherwise,

9

information that is readily ascertainable to the public, or information that a worker otherwise has

a right to disclose as legally protected conduct." COLO. REV. STAT. ANN. § 8-2-113(3)(b).

26.     The amended Colorado statute also imposes a notice requirement on employers for

non-compete and customer non-solicitation covenants not to be void and unenforceable.  The

notice requirement, required for all non-compete and customer non-solicitation covenants entered

into on or after the effective date of the amended statute (*i.e.*, August 10, 2022), provides, in

relevant part:

> Any covenant not to compete that is otherwise permissible under subsection (2) or
> (3) of this section is void unless notice of the covenant not to compete and the terms
> of the covenant not to compete are provided to: . . .(II) A current worker at least
> fourteen days before the earlier of: (A) The effective date of the covenant; or (B)
> The effective date of any additional compensation or change in the terms or
> conditions of employment that provides consideration for the covenant.

COLO. REV. STAT. ANN. § 8-2-113(4)(a).  Subsection (2) of the statute addresses non-compete and

customer non-solicitation covenants while subsection (3) of the statute addresses, among other

items, confidentiality/non-disclosure covenants and sale of business non-compete covenants.

27.     The statute requires an employer to provide the above notice "in a separate

document from any other covenants between the worker and employer and in clear and

conspicuous terms in the language in which the worker and employer communicate about the

worker's performance." COLO. REV. STAT. ANN. § 8-2-113(4)(b). The notice must be signed by

the employee. *Id.*

28.     The statute further states that an employer satisfies the notice requirement when the

notice is provided with a copy of the agreement containing the non-compete covenant, identifies

the agreement by name and states that the agreement contains a non-compete covenant that could

restrict the employee's options for subsequent employment following his separation, and directs

the employee to the specific sections or paragraphs of the agreement that contain the non-compete covenant. COLO. REV. STAT. ANN. § 8-2-113(4)(d).

**D. The Restrictive Covenants in the Agreement are Void and Unenforceable under Colorado Law.**

29.    In feigned compliance with the 2022 statutory amendments, Defendants updated the Agreement in 2022 to contain a section specific to Colorado employees that tracks *some* of the language of the revised Colorado Revised Statutes § 8-2-113, as follows:

> To the extent Associate works for the Company in the State of Colorado (or last worked for the Company in the State of Colorado, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Section 3.3 only applies if Associate earns at least 60% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (b) Section 3.4 only applies if Associate earns at least 100% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (c) Associate has at least fourteen (14) days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily; and (d) Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Sections 3.3 or 3.4 of this Agreement.

(Exhibit 3 at § 3.17.)

30.    However, the Agreement and, specifically, the Unauthorized Use or Disclosure, Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer Relationships, and Restriction on Unfair Competition provisions, in Sections 2.2, 3.2, 3.3, and 3.4, respectively, of the Agreement (collectively, the "Restrictive Covenants"), are void and unenforceable pursuant to the express statutory language of Colorado Revised Statutes § 8-2-113 for multiple reasons, including that: (i) the Agreement—and thus the Restrictive Covenants—are broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade

11

secrets; (ii) the Unauthorized Use or Disclosure provision is not reasonable; and (iii) to the extent

the Restrictive Covenants fall within the limited exceptions set forth in Colorado Revised Statutes

§ 8-2-113, Mikulka was not provided the requisite notice of the covenants not to compete and not

to solicit customers.

31.     First, the Agreement expressly seeks to protect Defendants' "Confidential

Information (as defined below), inventions and discoveries, specialized training, and its customer

relationships and other goodwill." (Exhibit 3 at p. 1.) When providing a definition of "Confidential

Information," the Agreement expressly notes that "Confidential Information includes trade secrets,

but an item of Confidential Information *need not qualify as a trade secret to be protected by this

Agreement.*" (*Id.* at § 2.1 (emphasis added.)) Thus, the Agreement—and the Restrictive Covenants

therein—are "broader than reasonably necessary to protect [Defendants'] legitimate interest in

protecting their *trade secrets*" and are therefore void. *See* COLO. REV. STAT. ANN. §§ 8-2-

113(1)(b); (2)(b); (2)(d).

32.     To the extent the Agreement subsequently attempts to limit the Restriction on

Interfering with Customer Relationships and Restriction on Unfair Competition "only to the extent

reasonably necessary to protect the [Defendants'] legitimate interest in protecting trade secrets" in

the Colorado-specific provision in Section 3.17 of the Agreement, Defendants—at best—create an

ambiguity in terms of the scope of the Agreement and what the covenants are designed to protect.

33.     Second, the Unauthorized Use or Disclosure provision in Section 2.2 of the

Agreement is not a "reasonable confidentiality provision." COLO. REV. STAT. ANN. § 8-2-

113(3)(b). Specifically, to the extent the provision fails to exclude from its definition of

"Confidential Information" any information that arises from Mikulka's "general training,

12

knowledge, skill, or experience, whether gained on the job or otherwise," and thus prohibits such information's use, the provision is void under Colorado law. *Id.* Indeed, as further discussed below, the definition of "Confidential Information" expressly includes "know-how" and "problem-solving techniques"—information that would certainly arise from Mikulka's general training, knowledge, skill, and experience. (*See* Exhibit 3 at § 2.1.)

34.    Third, the Agreement spans thirteen pages and contains several other restrictive covenants between Defendants and Mikulka—including post-employment non-compete and customer non-solicitation covenants.[9] Specifically, the "Protective Covenants" section contains a Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer Relationships, and Restriction on Unfair Competition—as well as several, state-specific restrictive covenant provisions. (*Id.* at § 3.) Given such covenants' inclusion in the Agreement, Defendants were required to comply with the notice requirements of Colorado Revised Statutes § 8-2-113(4).

35.    Even if the Restrictive Covenants fell within the limited exceptions to Colorado's general prohibition on covenants not to compete, Defendants plainly failed to provide Mikulka notice of the non-compete and customer non-solicitation covenants in the Agreement in a separate document from any other covenants between Mikulka and Defendants. COLO. REV. STAT. ANN. § 8-2-113(4)(b). Rather, the only notice provided to Mikulka was in the Agreement itself in the Colorado-specific provisions of Section 3.17. This notice failed to comply with the plain statutory requirements. Moreover, because Defendants failed to provide notice in a separate document from the Agreement, no notice was signed by Mikulka, as required by the statute.

---

[9] In addition to the "Protective Covenants" section, the Agreement includes sections discussing Mikulka's "Position of Trust" and his common law or statutory obligations with respect to his "Duty of Loyalty and Conflicts of Interests," as well as a section setting forth Mikulka's agreements with respect to the unauthorized use or disclosure of Confidential Information, as defined therein, recordkeeping, computer use, and mobile devices. (Exhibit 3 at §§ 1-2.)

36. Further, the Agreement contains a "Clarification of Restrictions" section that requires an employee to seek clarification in writing from an authorized representative or otherwise waive the right to later claim confusion over the scope or application of any restrictions therein. (Exhibit 3 at § 3.5.) This provision was seemingly included in acknowledgment that the terms of the Restrictive Covenants are not clear and conspicuous. *See* COLO. REV. STAT. ANN. § 8-2-113(4)(b). Thus, even if Section 3.17 satisfies the requirement to provide Mikulka notice of the restrictive covenants, which Plaintiffs deny, the Agreement itself does not contain clear and conspicuous terms, thereby nullifying the notice and failing to satisfy the statutory notice requirements.

37. Finally, despite purporting to provide a fourteen-day notice period to Mikulka—or otherwise requiring Mikulka to agree to waive Defendants' obligation to provide such notice—the Agreement expressly states that it is "AGREED to and effective as of the date of Associate's electronic acknowledgment." (Exhibit 3 at p. 13.) Defendants, therefore, did not comply with the fourteen-day notice requirement of the statute for current employees. *See* COLO. REV. STAT. ANN. § 8-2-113(4)(a). Accordingly, the Restrictive Covenants are void for failure to provide notice as required under Colorado law.

**E. The Restrictive Covenants in the Agreement Contain Overbroad Definitions and are Unreasonable in Scope.**

38. Even if the Agreement is not deemed void based on the preceding, the non-compete and non-solicitation covenants are overbroad, unreasonable, and, thus, unenforceable.

39. Specifically, for a period of two years following the end of his employment with Defendants, Section 3.3 of the Agreement provides that Mikulka "will not, directly or indirectly, personally or through others, solicit or communicate (regardless of who initiates the

14

communication) with a Covered Customer to induce or encourage the Covered Customer to: stop

or reduce doing business with Company; or, to buy a Conflicting Product or Service from or

otherwise refer a Covered Customer to a Competitor." (Exhibit 3 at § 3.3.) A "Covered Customer"

is defined in the Agreement as:

> [A] Company customer (person or entity) that in the two (2) year period preceding the end
> of Associate's employment with Company or such shorter period as the Associate may
> have been employed (the "**Look Back Period**"): (i) had business-related contact or
> dealings with Associate, (ii) was serviced or sold to *by another Company associate* whom
> Associate directly or *indirectly supervised*, (iii) was provided with a bid, proposal, pricing,
> margins, or other terms that Associate participated in determining or developing, or (iv)
> Associate *learned Confidential Information about.* A customer is understood to include a
> person or entity with whom Company is doing business, negotiating to do business, or
> actively pursuing a business relationship.

(*Id.* at § 3.1(a) (emphasis added).)

40.     As mentioned above, the term "Confidential Information" in the Agreement goes

well beyond trade secrets and instead encompasses "an item of information, or a compilation of

information, in any form (tangible or intangible), related to Company's business that Company

has not made public or authorized public disclosure of, and that is not generally known to the

public or to other persons who might obtain value or competitive advantage from its disclosure or

use." (*Id.* at § 2.1.) Further, while the Agreement provides examples of the various types of

information it purports to be "Confidential Information," the Agreement broadens the scope of the

term by clarifying that the definition "includes, *but is not limited to*" those examples. (*Id.* (emphasis

added).) Yet, the examples themselves are sufficiently vague to render the definition overbroad,

including items such as "internal reports," "internal business-related communications,"

"methods," "techniques," "know-how," "patterns," "processes," and "problem-solving

techniques." (*Id.*)

41.     Thus, the Restriction on Interfering with Customer Relationships—i.e., the Agreement's customer non-solicitation covenant—in Section 3.3 of the Agreement is overbroad and unenforceable because the definition of "Covered Customers" would include customers of Mikulka's *indirect subordinates* and any customer that Mikulka learned *any information about* that falls within the very vague and broad definition of Confidential Information.

42.     To put the scope of this provision in perspective, Mikulka's indirect subordinates included approximately 840 individuals and more than 1,000 customers would arguably be considered "Covered Customers" with respect to Mikulka based on his role as a regional President and the types of information to which he had access.

43.     Further, for the same two-year period following Mikulka's termination of employment, the Agreement contains a non-compete covenant, providing, in relevant part, that Mikulka will not:

> [A]ccept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, *or learned Confidential Information* about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has engaged in material business activities for Company in person, by phone or other remote means, or through correspondence during the Look Back Period; (ii) all states, provinces, counties, boroughs, or parishes included within any geographical region or market that Associate directly or indirectly serviced or managed on behalf of Company during the Look Back Period; (iii) *any state, county, borough, parish or other geographic region as to which Associate had access to Confidential Information during the Look Back Period*; and (iv) *any state, county, borough, parish or other geographic region in which the Associate's Business Unit conducted business during the Look Back Period.* **"Business Unit"** means the business segment which *Company* was a part of during the Look Back Period . . ."

(*Id.* at § 3.4 (emphasis added).)

16

44.    Again, given the inclusion of the broadly defined terms and expansive language, the Restriction on Unfair Competition—*i.e.*, the Agreement's non-compete covenant—in Section 3.4 of the Agreement is overbroad and unenforceable. First, the non-compete covenant's activity prohibition is not limited to the same or similar work Mikulka actually performed in his last role with Defendants, but instead includes any activities or services that are the same as or similar to those Mikulka "learned Confidential Information about" during the last two years of his employment. (*Id.*) This restriction, in essence, means that Mikulka is prohibited from working for a "Competitor" in any capacity—whether as an executive, regional president, truck driver, butcher, or janitor.

45.    Second, and similar to the activity restriction, the geographic scope of the non-compete purports to encompass any territory as to which Mikulka "had access to Confidential Information" during the last two years of his employment with Defendants. (*Id.* at § 3.4(iii).) As discussed above, given the boundless and vague definition of "Confidential Information," this restriction is overbroad in that it would include any territory as to which Mikulka had access to *any* Sysco information, regardless of the true confidential or trade secret nature of the information or extent of his actual knowledge. Theoretically, if Mikulka received an email during the last two years of his employment about Sysco's operations outside of his geographic territory, his receipt of such email would prohibit him from working for a competitor in the geographic areas to which the email related. Subsection (iii) of the "Restricted Area" definition, therefore, makes the non-compete covenant apply nationwide—or even globally. Similarly, the "Restricted Area" definition improperly includes any territory as to which Mikulka had access to—whether or not he, in fact, did access or learn—such Confidential Information.

17

46.     Further, the "Restricted Area" definition includes any territory that Mikulka's "Business Unit" conducted business, but the Agreement defines "Business Unit" as "the business segment which *Company* (i.e., Defendants) was a part of during the Look Back Period," not Mikulka. (*Id.* at § 3.4.) Thus, the "Restricted Area" for purposes of Mikulka's two-year non-compete covenant would span across *any territory* that Defendants conduct business—even if Mikulka himself did not conduct business in that particular region. Subsection (iv) of the "Restricted Area" definition, therefore, results in a global non-compete covenant.

47.     Additionally, both the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are overbroad because they rely on the defined term "Competitor." The Agreement defines a "Competitor" as any person or entity that directly or indirectly provides a "Conflicting Product or Service" to customers or prospective customers of Defendants. (*Id.* at § 3.1(c).) In turn, the Agreement defines "Conflicting Product or Service" as any product and/or service that Mikulka was provided Confidential Information about during the two years preceding Mikulka's termination, including products and services merely under development during that time. (*Id.* at 3.1(b).) Examples of "Conflicting Product or Services" include, *but are not limited to*:

> The negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(*Id.*)

18

48.     Thus, to the extent Defendants provided Mikulka with any information related to any of its developed or undeveloped food or "nonfood" products—ranging from medical and surgical supplies to hotel and motel textiles—the customer non-solicitation covenant and non-compete covenant's use of the term "Competitor" in Sections 3.3 and 3.4, respectively, of the Agreement essentially ban Mikulka from being employed in virtually any industry that even remotely relates to food. Illustratively, if this Court were to enforce the Restrictive Covenants as written in the Agreement, Mikulka would be prohibited from seeking employment with Costco, Walmart, H-E-B, Ikea, 7-Eleven, Nordstrom's, or even the Dollar Store, to name a few—all companies that are not considered competitors of Defendants.

49.     Finally, the Restriction on Interfering with Employee Relationships in Section 3.2 of the Agreement is overbroad and unenforceable given its application to all of Defendants' employees, as opposed to the employees that Mikulka supervised or worked with during the last two years of his employment. According to Sysco's LinkedIn page, Sysco has more than 74,000 colleagues—all of which Mikulka is prohibited from not just soliciting or encouraging to leave Defendants, but even from identifying or evaluating for potential recruitment away from Defendants. The employee non-solicitation covenant, therefore, serves no legitimate business interest given its excessive scope.

**F.  Additionally—and Alternatively—the Preceding SPCAs are Likewise Overbroad and Unenforceable.**

50.     In the event this Court were to find that the Agreement does not supersede all prior versions of the SPCA, the August 2020 SPCAs and August 2021 SPCAs accepted by Mikulka (the "Preceding SPCAs") featured many of the same broadly defined terms and were similar in

19

overbroad scope as the Agreement. Accordingly, the non-compete and non-solicitation covenants in the Preceding SPCAs are similarly unenforceable. (*See* Exhibits 1 and 2.)

51.    Specifically, the Preceding SPCAs' Restriction on Interfering with Customer Relationships and Restriction on Unfair Competition incorporate the defined terms of "Confidential Information," "Covered Customer," "Conflicting Product or Service," and/or "Competitor." (*See* Exhibits 1 and 2 at §§ 3.3, 3.4.) "Confidential Information" is again boundlessly defined, with vague examples like "techniques" and "know how." (Exhibits 1 and 2 at § 2.1.) A "Covered Customer" is again defined to include those customers that were serviced or sold to by a company associate that Mikulka *indirectly* supervised as well as those customers Mikulka "learned confidential information about." (Exhibits 1 and 2 at § 3.1(a).) Notably, the definition of "Covered Customer" in the Preceding SPCAs is even more vague than the same defined term in the Agreement, given that it fails to use the defined term "Confidential Information." Rather, the definition uses the undefined (lowercase) term "confidential information." (Exhibits 1 and 2 at § 3.1(a).) Finally, the term "Competitor" in the Preceding SPCAs similarly defines the term as those entities in a line of business that involves providing a "Conflicting Product or Service," which again includes any products and services that Mikulka was involved in or was provided "Confidential Information" about, including food or non-food related products. (Exhibits 1 and 2 at § 3.1(b).)

52.    Accordingly, the Preceding SPCAs' Restrictions on Interfering with Customer Relationships (in Section 3.3) are overbroad and unenforceable because they purport to prohibit Mikulka from soliciting or communicating with any "Covered Customer"—regardless of whether Mikulka himself had a business relationship with that customer or learned trade secret information

about such customer—or from referring a Covered Customer to a Competitor or Conflicting Product or Service. Again, given the broad definitions used, this covenant can be read to encompass thousands of customers, all of Defendants' food and non-food product offerings, and companies that are not actual competitors of Defendants.

53. Similarly, the Preceding SPCAs' Restrictions on Unfair Competition (in Section 3.4), which prohibit Mikulka from accepting employment with a "Competitor," prohibit Mikulka from an overbroad range of employment with any entity whose business has some relation to food or non-food related products. Specifically, pursuant to the lines of business the Agreement deems to be a "Conflicting Product or Service," Mikulka is prohibited from seeking employment with entities in a business related to the "food or related nonfood products" distributed by Defendants to restaurants, healthcare and educational facilities, lodging establishments "or other similar customers." (Exhibits 1 and 2 at 3.1(b).) Further, the non-compete covenant's activity prohibition is not limited to the same or similar work Mikulka actually performed in his last role with Defendants, but instead includes any activities or services that are the same as or similar to those Mikulka "learned Confidential Information about" during the last two years of his employment. (Exhibits 1 and 2 at § 3.4.) As discussed above, this restriction means that Mikulka is prohibited from working for a "Competitor" in any capacity.

54. The Preceding SPCAs' Restrictions on Interfering with Employee Relationships (in Section 3.2) are also overbroad and unenforceable given their application to all of Defendants' employees, as opposed to the employees that Mikulka supervised or worked with during the last two years of his employment. (Exhibits 1 and 2 at § 3.2.)

55.     Thus, the non-compete, employee non-solicitation, and customer non-solicitation covenants in the Preceding SPCAs, to the extent the Agreement (and each later signed version) did not supersede them—which Plaintiffs deny—are similarly overbroad and unenforceable under Colorado law.

**G. Defendants Terminated Mikulka Without Cause and Mikulka Remained Unemployed for More than a Year before Accepting a Role at PFG.**

56.     On July 10, 2023, Defendants terminated Mikulka's employment without notice and effective immediately. Mikulka was terminated without cause. In fact, Defendants made it clear that Mikulka's termination was not performance based and, instead, Defendants were merely looking to go in a different direction.

57.     Mikulka remained unemployed for more than a year following his termination.

58.     Then, on October 9, 2024, PFG offered Mikulka the role of President, Regional-West at PFG. (PFG Offer Letter, attached hereto as Exhibit 4.)

59.     Delivering food since 1885, PFG is engaged in the distribution or sale of food products to customers throughout the United States, with customers including independent restaurants, national chain restaurants, and sports facilities. Through its various operating companies and subsidiaries, PFG has over 30,000 associates working in 150 distribution centers nationwide to service more than 300,000 customer locations.

60.     Mikulka accepted PFG's offer of employment and is scheduled to officially begin his employment with PFG on October 13, 2024. In this role, Mikulka will perform duties to ensure the growth of and assist in achieving business plan targets and sales within his designated region—which includes distribution centers and customers throughout Colorado and New Mexico.

61. On information and belief, Defendants will seek to enforce the Restrictive Covenants in the Agreement accepted by Mikulka. Further, Plaintiffs anticipate that Mikulka's job duties and responsibilities in his role at PFG will be similar to those he had in his last position with Defendants and encompass some of the geographic region for which Mikulka was responsible in his last position with Defendants. Accordingly, Mikulka's employment with PFG will fall within the overbroad scope of the void restrictive covenants in the Agreement.

62. Plaintiffs, therefore, will be directly and materially impacted by Defendants' enforcement or potential enforcement of the Agreement or the Preceding SPCAs, in whole or in part, and face significant and material legal uncertainty as to whether and to what extent Mikulka will be bound by the terms of the Agreement and/or the Preceding SPCAs.

## CAUSE OF ACTION

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF
### Colo. Rev. Stat. Ann. § 8-2-113(7); C.R.C.P. 57

63. Plaintiffs incorporate the preceding paragraphs by reference.

64. Mikulka is an employee that was a party to the Agreement which contains non-compete and non-solicitation covenants. The Agreement, last accepted by Mikulka on October 3, 2022, replaces and supersedes the Preceding SPCAs. Mikulka and PFG, as his subsequent employer, seek a declaratory judgment that the Agreement superseded the Preceding SPCAs and the non-compete and non-solicitation covenants in the Agreement are void and unenforceable. Plaintiffs seek this declaratory judgment pursuant to Colorado Revised Statutes § 8-2-113(7), as well as Colorado Rule of Civil Procedure 57.

65. Specifically, Plaintiffs contend that the Unauthorized Use or Disclosure, Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer

23

Relationships, and Restriction on Unfair Competition sections contained in the Agreement, in Sections 2.2, 3.2, 3.3, and 3.4, respectively, are void and unenforceable under applicable Colorado law—including, without limitation, Colorado Revised Statutes § 8-2-113—because: (i) the Restrictive Covenants are broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade secrets; (ii) the Unauthorized Use or Disclosure provision is not a reasonable confidentiality provision; (iii) to the extent the Restrictive Covenants fall within the limited exceptions set forth in Colorado Revised Statutes § 8-2-113, Defendants failed to provide Mikulka the requisite notice of the non-compete and customer non-solicitation covenants; and (iv) the Restrictive Covenants are overbroad, unreasonable, and unenforceable given the expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Conflicting Product or Service," "Confidential Information," "Restricted Area," and "Business Unit." (*See* Exhibit 3.) Therefore, the Restrictive Covenants cannot and do not in any way limit or restrict Mikulka's right or ability to work for PFG in Colorado, New Mexico, or any other geographic region or PFG's right or ability to recruit or employ Mikulka in the role for which PFG is hiring him.

66.     Alternatively, to the extent this Court finds the Agreement did not supersede the Preceding SPCAs, Plaintiffs contend that the Unauthorized Use or Disclosure, Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer Relationships, and Restriction on Unfair Competition provisions contained in the Preceding SPCAs, in Sections 2.3, 3.2, 3.3, and 3.4, respectively, are unenforceable under applicable Colorado law because they are overbroad and unreasonable given the expansive language and respective use of the defined

24

terms "Covered Customer," Competitor," "Conflicting Product or Service," and "Confidential Information" and undefined term "confidential information." (*See* Exhibits 1 and 2.)

67.　　Further, and in the alternative, this Court should find the Restrictive Covenants in the Agreement, as well as the non-competition and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), unenforceable as a matter of equity because Defendants terminated Mikulka without cause over a year ago and nonetheless seek, or will seek, to prohibit Mikulka from seeking gainful employment within the State of Colorado for the remaining nine months of his restrictive covenants.

68.　　Plaintiffs respectfully request a judicial determination of the parties' rights and duties under or in relation to the Agreement, including a declaration that the Restrictive Covenants in the controlling agreement are void, unlawful, and unenforceable under Colorado law.

69.　　Further, Plaintiffs seek temporary, preliminary, and/or permanent injunctive relief restraining and enjoining Defendants from enforcing or attempting to enforce any of the Restrictive Covenants. COLO. REV. STAT. ANN. § 8-2-113(8)(b) ("The attorney general and any worker or prospective worker harmed by an employer's conduct may bring an action for injunctive relief and to recover penalties."). Unless and until enjoined and restrained by order of this Court, any such enforcement or attempted enforcement by Defendants will cause harm to Plaintiffs. Plaintiffs also seek actual damages, reasonable costs, and attorney fees associated with the bringing of this action. *Id.*

70.　　Alternatively, and only to the extent the Court reforms the Restrictive Covenants, or the non-compete or non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), instead of finding them wholly void and unenforceable, the Court should modify the

Agreement (and, to the extent applicable, the Preceding SPCAs) to limit and more clearly define the "Confidential Information" and trade secrets purportedly protected and impose reasonable limits on the scope of activity and geographical restrictions of the Restrictive Covenants, including with respect to "Covered Customers," "Competitors," "Conflicting Product or Service," and "Restricted Area."

71.     Finally, and only to the extent this Court finds that the Restrictive Covenants are enforceable despite the preceding arguments, PFG asks that this Court find Mikulka's employment with PFG is not in violation of the Agreement's (or, to the extent applicable, the Preceding SPCAs') terms because PFG will, if required by the Court, remove Denver, Colorado and New Mexico from the scope of Mikulka's area of supervision for the remainder of the two-year period under the Restrictive Covenants or the non-compete or non-solicitation covenant in the Preceding SPCAs (to the extent still controlling).

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request that the Court:

A. Enter a judgment declaring that the Agreement accepted by Mikulka on October 3, 2022 is controlling and subject to the version of Colorado Revised Statutes § 8-2-113 effective as of August 10, 2022;

B. Enter a judgment declaring that the preceding versions of the SPCA accepted by Mikulka were superseded by the Agreement entered on October 3, 2022;

C. Enter a judgment declaring the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are void because they are broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade secrets (COLO. REV. STAT. ANN. § 8-2-113(2)(b), (2)(d));

D. Enter a judgment declaring the Unauthorized Use or Disclosure provision in Section 2.2 of the Agreement is not a "reasonable confidentiality provision" to the extent it prohibits "disclosure of information that arises from the worker's general training,

knowledge, skill, or experience, whether gained on the job or otherwise" (COLO. REV. STAT. ANN. § 8-2-113(3)(b));

E. Enter a judgment declaring the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are void because Defendants failed to provide the requisite statutory notice of such covenants (COLO. REV. STAT. ANN. § 8-2-113(4));

F. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restriction on Interfering with Employee Relationships, the Restriction on Interfering with Customer Relationships, and the Restriction on Unfair Competition in Sections 3.2, 3.3, and 3.4, respectively, of the Agreement are overbroad, unreasonable, and, thus, unenforceable given the use of expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Conflicting Product or Service," "Confidential Information," "Restricted Area," and "Business Unit," as set forth above;

G. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restriction on Interfering with Employee Relationships, the Restriction on Interfering with Customer Relationships, and the Restriction on Unfair Competition in Sections 3.2, 3.3, and 3.4, respectively, of the Preceding SPCAs are overbroad, unreasonable, and, thus, unenforceable given the use of expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Confidential Information," "Conflicting Product or Service" and undefined term "confidential information," as set forth above;

H. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restrictive Covenants in the Agreement, as well as the non-compete and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), are unenforceable as a matter of equity based on Defendants' termination of Mikulka without cause over a year ago;

I. Alternatively, and to the extent necessary, modify the Restrictive Covenants in the Agreement, as well as the non-compete and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), to appropriately limit such provisions in accordance with Colorado Revised Statutes § 8-2-113 and applicable Colorado case law;

J. Alternatively, and only in the event this Court finds the Restrictive Covenants in the Agreement (or, as applicable, the non-compete and non-solicitation covenants in the Preceding SPCAs) to be enforceable, enter a judgment declaring that Plaintiffs are not in violation of the non-compete covenants so long as PFG removes Denver, Colorado and New Mexico from the scope of Mikulka's geographic areas of responsibility for the remainder of the non-compete covenants' two-year term (through July 10, 2025);

K. Enter temporary, preliminary, and permanent injunctive relief restraining and enjoining Defendants from enforcing the Restrictive Covenants in the Agreement (Colo Rev. Stat. Ann. § 8-2-113(8)(b)) or, as applicable, the non-compete and non-solicitation covenants in the Preceding SPCAs;

L. Award Plaintiffs all actual damages, reasonable costs, and attorney fees incurred as a result of bringing this action as allowed by law, including, without limitation, Colorado Revised Statutes § 8-2-113(8)(b);

M. Impose a penalty of $5,000 on Defendants, pursuant to Colorado Revised Statutes § 8-2-113(8)(b); and

N. Award Plaintiffs such other and further relief the Court may deem just and proper.

Dated: October 11, 2024                          Respectfully submitted,

                                                 */s/ Charles W. Weese*
                                                 Charles W. Weese (No. 32912)
                                                 Jessica P. Marsh (No. 53473)
                                                 WILLIAMS WEESE PEPPLE & FERGUSON PC

                                                 Yasser A. Madriz*
                                                 Meghaan C. Madriz*
                                                 Miles O. Indest*
                                                 Sarah Holub*
                                                 MCGUIREWOODS LLP
                                                 *(*pro hac vice application forthcoming*)

                                                 **ATTORNEYS FOR PLAINTIFFS
                                                 PERFORMANCE FOOD GROUP, INC.
                                                 AND WILLIAM MIKULKA**

Plaintiff's Address:

Performance Food Group, Inc.
12500 West Creek Parkway
Richmond, Virginia 23238

William Mikulka
8287 Whisper Wood Court
Parker, CO 80134

28

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO**<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>October 11, 2024 12:24 PM<br>FILING ID: 24555457265A1<br>CASE NUMBER: 2024CV33128 |
| **Plaintiff:**<br><br>PERFORMANCE FOOD GROUP, INC. and WILLIAM MIKULKA<br>v.<br><br>**Defendants:**<br><br>SYSCO CORPORATION, SYSCO DENVER, INC., SYSCO NEW MEXICO USA, and SYSCO USA I, INC. | **▲ COURT USE ONLY ▲** |
| *Attorneys for Plaintiffs Performance Food Group, Inc. and William Mikulka*<br><br>Charles W. Weese, No. 32912<br>Jessica P. Marsh, No. 53473<br>WILLIAMS WEESE PEPPLE & FERGUSON PC<br>1801 California Street, Suite 3400<br>Denver, Colorado 80202<br>Telephone: (303) 861-2828<br>cweese@williamsweese.com<br>jmarsh@williamsweese.com<br><br>Yasser A. Madriz*<br>Meghaan C. Madriz*<br>Miles O. Indest *<br>Sarah Holub*<br>MCGUIREWOODS LLP<br>845 Texas Avenue, Suite 2400<br>Houston, Texas 77002<br>Telephone: (832) 255-6361<br>ymadriz@mcguirewoods.com<br>mmadriz@mcguirewoods.com<br>mindest@mcguirewoods.com<br>sholub@mcguirewoods.com<br>*(pro hac vice application forthcoming)* | Case No. _____<br><br>Division/Courtroom: _____ |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANTS:**    SYSCO CORPORATION
SYSCO DENVER, INC.
SYSCO NEW MEXICO USA
SYSCO USA I, INC.

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer

or other response to the attached Complaint. If service of the Summons and Complaint was made

upon you within the State of Colorado, you are required to file your answer or other response

within 21 days after such service upon you. If service of the Summons and Complaint was made

upon you outside of the State of Colorado, you are required to file your answer or other response

within 35 days after such service upon you. Your answer or counterclaim must be accompanied

with the applicable filing fee.

     If you fail to file your answer or other response to the Complaint in writing within the

applicable time period, the Court may enter judgment by default against you for the relief

demanded in the Complaint without further notice.

     Respectfully submitted this 11th day of October 2024.

                WILLIAMS WEESE PEPPLE & FERGUSON PC

                */s/ Charles W. Weese*
                Charles W. Weese (No. 32912)
                Jessica P. Marsh (No. 53473)

                (Original on file at offices of Williams Weese Pepple &
                Ferguson PC, pursuant to C.R.C.P. 121, § 1-26)

                **ATTORNEYS FOR PLAINTIFF**

This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.

WARNING:  A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal.  The plaintiff has 14 days from the date this summons was served on you to file the case with the court.  You are responsible for contacting the court to find out whether the case has been filed and obtain the case number.  If the plaintiff files the case within this time, then you must respond as explained in this summons.  If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

3

| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>October 11, 2024 12:24 PM<br>FILING ID: 24555457265A1<br>CASE NUMBER: 2024CV33128 |
|---|---|
| **Plaintiff:**<br><br>PERFORMANCE FOOD GROUP, INC. and WILLIAM MIKULKA<br>v.<br><br>**Defendants:**<br><br>SYSCO CORPORATION, SYSCO DENVER, INC., SYSCO NEW MEXICO USA, and SYSCO USA I, INC. | ↑ **COURT USE ONLY** ↑ |
| *Attorneys for Plaintiffs Performance Food Group, Inc. and William Mikulka*<br><br>Charles W. Weese, No. 32912<br>Jessica P. Marsh, No. 53473<br>WILLIAMS WEESE PEPPLE & FERGUSON PC<br>1801 California Street, Suite 3400<br>Denver, Colorado 80202<br>Telephone: (303) 861-2828<br>cweese@williamsweese.com<br>jmarsh@williamsweese.com<br><br>Yasser A. Madriz*<br>Meghaan C. Madriz*<br>Miles O. Indest *<br>Sarah Holub*<br>MCGUIREWOODS LLP<br>845 Texas Avenue, Suite 2400<br>Houston, Texas 77002<br>Telephone: (832) 255-6361<br>ymadriz@mcguirewoods.com<br>mmadriz@mcguirewoods.com<br>mindest@mcguirewoods.com<br>sholub@mcguirewoods.com<br>*(pro hac vice application forthcoming)* | Case No. _____<br><br>Division/Courtroom: _____ |

---

**DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING
OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD-PARTY
COMPLAINT AND JURY DEMAND**

---

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases or in Water (CW) proceedings subject to sections 37-92-302 to 37-92-305, C.R.S. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

   ☒   This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

   ☐   This party is seeking a monetary judgment against another party for more than $100,000.00, including any penalties or punitive damages, but excluding attorney fees, interest and costs, as supported by the following certification:

   By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000.

**Or**

   ☐   Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

   ☐   This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38. (Checking this box is optional.)

Dated:  October 11, 2024

                                    /s/ Charles W. Weese
                                    Charles W. Weese (No. 32912)
                                    Jessica P. Marsh (No. 53473)

WILLIAMS WEESE PEPPLE & FERGUSON PC
1801 California Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 861-2828
cweese@williamsweese.com
jmarsh@williamsweese.com

Yasser A. Madriz*
Meghaan C. Madriz*
Miles O. Indest *
Sarah Holub*
MCGUIREWOODS LLP
845 Texas Avenue, Suite 2400
Houston, Texas 77002
Telephone: (832) 255-6361
ymadriz@mcguirewoods.com
mmadriz@mcguirewoods.com
mindest@mcguirewoods.com
sholub@mcguirewoods.com
*(pro hac vice application forthcoming)

(Original on file at offices of Williams Weese Pepple &
Ferguson PC, pursuant to C.R.C.P. 121, § 1-26)

## ATTORNEYS FOR PLAINTIFF

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint,
counterclaim, cross-claim, or third party complaint.

3

<table>
<tr><td>DISTRICT COURT, CITY AND COUNTY OF DENVER,<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202</td><td>DATE FILED<br>October 11, 2024 2:14 PM<br>CASE NUMBER: 2024CV33128</td></tr>
<tr><td>Plaintiff: Performance Food Group, Inc. and William Mikulka<br>v.<br><br>Defendants: Sysco Corporation, Sysco Denver, Inc., Sysco<br>New Mexico USA and Sysco USA I, Inc.,</td><td>Case No. 2024CV33128<br>Courtroom 424</td></tr>
<tr><td colspan="2" align="center"><strong>DELAY REDUCTION ORDER</strong></td></tr>
</table>

All civil courtrooms are on a delay reduction docket.

**IF AN ATTORNEY OR PRO SE PARTY FAILS TO COMPLY WITH THIS ORDER, THE COURT MAY DISMISS THE CASE WITHOUT PREJUDICE. THIS ORDER IS THE INITIAL NOTICE REQUIRED BY C.R.C.P 121 § 1-10, AND C.R.C.P. 41(B)(2).**

A.    In all civil actions, the following deadlines must be met:

1.    <u>**Service of Process:**</u>  Proof of service of process under C.R.C.P. 4 for all defendants must be filed within **63 days** after the date of filing of the complaint. After **63 days**, the action may be dismissed by the Court against any defendant for whom proof of service has not been filed.

2.    <u>**Default:**</u>  Motions for default must be filed within **14 days** after default has occurred, and must comply with C.R.C.P. 121(c) § 1-14.  Reasonable inquiry regarding a person's military status requires confirmation through the Department of Defense's Servicemembers Civil Relief Act website (https://scra.dmdc.osd.mil) or equivalent confirmation.

3.    <u>**Trial Setting:**</u>  The Responsible Attorney as defined in C.R.C.P. 16(b)(2) must file and serve a Notice to Set the case for trial and must complete the setting of the trial no later than **14 days** from the date the case is at issue.  Counsel may call the courtroom to set trials only on Tuesdays, Wednesdays, and Thursdays from 10:00 a.m. until noon.

4.    <u>**Cases filed under C.R.C.P. 16:**</u>

a) **Case Management Conference:** The notice to set trial must also include a notice to set a Case Management Conference to be held no later than **49 days** after the case is at issue. Counsel may call the courtroom to set case management conferences only on Tuesdays, Wednesdays, and Thursdays from 10:00 a.m. until noon.

b) **Proposed Case Management Order:** At least **7 days** before the Case Management Conference, the parties must file a proposed Case Management Order.

c) **Waiver of Case Management Conference:** If all parties are represented by counsel, a joint request to waive the case management conference may be included in the proposed Case Management Order. Unless such a request has been granted, counsel must appear for the case management conference.

5. **Cases filed under C.R.C.P. 16.1:**

   **Certificate of Compliance:** Not later than **49 days** after the case is at issue, the Plaintiff (or the Responsible Attorney) must file a Certificate of Compliance as required under C.R.C.P. 16.1(h). No Case Management Order or Case Management Conference is required.

B. Additionally, in all civil actions the following provisions apply:

   1. **Service of this Order.** The Plaintiff or Responsible Attorney must send a copy of this Order to all other parties who enter their appearance.

   2. **Related Cases.** An attorney entering an appearance in this case who is aware of a related case is ordered to complete and file in this case an Information Regarding Related Case(s) form, available in Room 256 of the City and County Building or on line at:

https://www.courts.state.co.us/userfiles/file/Information_Regarding_Related_Cases_Form(1).doc

C. **Interpreters.** If any party or witness will require an interpreter, please notify the Courtroom Clerk as soon as possible and in no event later than 91 days before the trial date.

Done: October 11, 2024

BY THE COURT:

Martin F. Egelhoff
District Court Judge

cc: All Parties

2

<table>
<tr><td>

**DISTRICT COURT, CITY AND COUNTY OF DENVER COLORADO**

**Address:**    **City and County Building**
             **1437 Bannock Street**
             **Denver, CO  80202**

</td><td>

DATE FILED
October 11, 2024 2:17 PM
CASE NUMBER: 2024CV33128

�led   **COURT USE ONLY**   ▴

</td></tr>
</table>

| | |
|---|---|
| **Plaintiff(s):  Performance Food Group, Inc. and William Mikulka,**<br><br>**v.**<br><br>**Defendant(s): Sysco Corparation, Sysco Denver, Inc., Sysco New Mexico USA, and Sysco USA I, Inc. .** | **Case Number: 2024CV33128**<br><br>**Courtroom: 424** |

---

### P R E T R I A L   O R D E R

**(Simplified procedure C.R.C.P. 16.1 Cases – Filed On or After September 1, 2018)**

---

I.      **CIVILITY**

This Court is, first and foremost, a civil court. In accordance with the Preamble to the Colorado Rules of Professional Conduct, attorneys are not only representatives of clients, but are also officers of the legal system and public citizens having special responsibility for the quality of justice. Preamble [1]. Attorneys may not use the law's procedures for illegitimate purposes or to harass or intimidate others. Preamble [5]. Attorneys are expected to demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. Preamble [5].

The Court therefore expects civility among counsel at all times, both in and outside of the courtroom. The Court will not tolerate rudeness, aggressive tactics, or personal attacks in the course of the case. Counsel and parties are expected to treat the Court, opposing counsel, parties, witnesses, jurors and the court staff with courtesy and respect at all times. This applies to all conduct and communications, verbal and nonverbal, written and oral, in and out of the courtroom. Attempts to

harass and/or intimidate by threatening to seek sanctions are contrary to the Preamble of the Rules of Professional Conduct and will not be tolerated.

Expressions of opinion that tend to denigrate another's integrity are not persuasive, will not be well-received, and are more likely to reflect more negatively on the author than on the object of the remark. Adjectives, both in written pleadings and oral communications, should be used sparingly and never in a manner that maligns, denigrates, or otherwise attacks opposing counsel.

The Court will address conduct that is contrary to this order and apply enforcement mechanisms as necessary.

## II.    **DUTY TO CONFER**

The Court expects complete and good faith compliance with C.R.C.P. 121 section 1-12(1) and (5), and section 1-15(8).

Counsel are expected to initiate efforts to confer well enough before the anticipated filing date to enable two-way communication. Certification that a telephone call, e-mail or fax was directed to opposing counsel fewer than 24 hours before the pleading was intended to be filed and "no response" was received is per se **not** a good faith effort.

It is the expectation of the Court that counsel confer either face-to-face or on the telephone; the Court regards a letter or e-mail message to constitute "notice," but not a sufficient attempt to confer. If attempts to confer are unsuccessful, the certification must describe the attempts in detail. Any pleading not in compliance with C.R.C.P. 121 and this Order will be stricken.

## III.    **CASE MANAGEMENT CONFERENCE**

1. A Case Management Conference shall be scheduled to occur **no later than** 42 days after the case is "at issue" (as defined in C.R.C.P. 16(b)(1) in the following types of cases:

    a. **Pro Se/Self Represented Parties.** Under C.R.C.P. 16.1(j), the Court is required to conduct a Case Management Conference on any case with a *pro se* or self represented party. The Case Management Conference shall be scheduled by the "responsible attorney" as defined in C.R.C.P. 16(b)(2).

    b. **Cases with Trials Exceeding Five (5) Days or Setting More Than One (1) Year After Case At Issue.** In any case where any party is requesting to set the case for a trial of more than five (5) days, or where the case being set beyond one year from the filing of the complaint, the Court will conduct an in-person Case Management Conference with lead counsel for all parties present.

2

    c.  **Where Party Believes Case Management Conference Would Be Helpful.**
The Court will conduct a Case Management Conference in any case where any
party believes that it would be helpful to prompt and efficient resolution of the
case, under C.R.C.P. 16.1(j).

2. Under C.R.C.P. 16.1(f) Case Management Orders are no longer required.

3. Per C.R.C.P. 16.1(g), all cases shall be set for trial (and a pre-trial conference) 14 days
after the case is "at issue" (as defined in C.R.C.P. 16(b)(1).) Trial settings may be
obtained Tuesday through Thursday between the hours of 10:00 a.m. and noon.

The Court adheres to the provisions of Chief Justice Directive (CJD) 08-05 which
requires that 90% of all civil actions filed shall be concluded within one year of filing.

IV.    <u>**CASE PREPARATION CHECKLIST**</u>

1. <u>**No Written Discovery Motions**</u>.  <u>NO WRITTEN DISCOVERY MOTIONS
WILL BE ACCEPTED. THE COURT WILL ADDRESS ALL DISCOVERY
DISPUTES WITH AN IN PERSON DISCOVERY HEARING INSTEAD OF
WRITTEN MOTIONS.</u> The purpose of this procedure is to ensure expedited and
inexpensive resolution of discovery disputes. The following procedures will be
in effect in this case:

    a.  If there is a discovery dispute, the attorneys are expected to confer in a
meaningful way, consistent with the provisions of this order, to try to resolve
it.

    b.  If counsel cannot resolve the dispute, counsel shall place a joint conference
call to the clerk at 303-606-2433 to schedule an in-person hearing on the
Court's calendar, preferably within one week. Once the matter is set, each
party may file a pleading **not to exceed three pages** describing the issue(s)
and listing any authority. Pertinent discovery and disclosures may be
attached.

    c.  If counsel are unable to jointly call the clerk, the attorney contacting the clerk
should have available dates on opposing counsel's calendar. If opposing
counsel does not cooperate in scheduling a hearing, advise the clerk of the
efforts made to obtain their input and the Court will set a hearing
accordingly.

    d.  The dispute will be argued and resolved at the hearing, or taken under
advisement with a prompt ruling by the Court.

2. <u>**Motions for Protective Order under C.R.C.P. 16.1(k)(1)(B)(i) and (ii).**</u>

3

Motions for Protective Order will be treated as a disputed discovery issue. No written motions will be accepted. Instead, please use the following procedure.

Any party who is seeking not to produce specific records set forth in C.R.C.P. 16.1(k)(1)(B)(i) and/or (ii) shall:

    a.  E-file a Notice of a Request for Protective Order which will include a brief description of item(s) being withheld; the reason(s) the items are being withheld; and the relief requested;

    b.  Have paper copies of the items that are the subject of the Motion for Protective Order, **with the disputed entries highlighted in yellow,** delivered to Courtroom 424. These records will be uploaded by the Court to the electronic court file as "sealed" documents, meaning that the documents will not be accessible except to the Court and for appellate purposes.

    c.  The Court will attempt to rule on all Motions for Protective Order within one (1) week. If you have not received a ruling within (10) days after the records are delivered, please contact the division staff of Courtroom 409 and advise them on the pending Motion for Protective Orders.

3.  **Non-Disputed Motions for Extension of Time**.

Stipulated agreements to extend the dates for filing discovery responses, objections, and disclosures of *no more than 7 days* do not need to be filed with the Court. <u>THIS DOES NOT APPLY TO THE DEADLINES FOR FILING MOTIONS. PLEASE SEE § 4 BELOW.</u>

4.  **Written Motions**

It is the expectation that all motions, briefs, and other written submissions filed with the court are the original work of the attorney or attorneys who sign the pleading. If Chat GPT or other AI is used to generate any written product filed with this Court, a notice shall appear on the first page of the filing indicating that AI was used to generate all or part of the filing, as well as the specific portions of the filing (e.g., page number and paragraphs or lines) which contain the AI-generated content.

Please remember the page and word limits under C.R.C.P. 121, section 1-15(1). The Court takes these limits seriously. So should you.

5.  **Pretrial Motions**. The Court adheres strictly to C.R.C.P. 16(c) and its deadlines.

    **a.**  Motions for summary judgment must be filed at **least 91 days (13 weeks)** before trial. The Court will generally not grant extensions of time to file summary judgment motions. The late filing of motions for summary

4

judgment does not permit the Court sufficient time to rule in advance of trial. A motion filed outside of this time limit may be summarily denied as untimely.

    **b.** All other pretrial motions, including motions *in limine*, must be filed **no less than 35 days** before trial, except for motions challenging the admissibility of expert testimony pursuant to C.R.S. 702, which must be filed no later than **70 days (10 weeks)** before the trial. A written response may be filed no later than 14 days after the motion is filed. No reply to a motion *in limine* shall be allowed unless ordered by the Court. Any motion filed contrary to this time limit may be summarily denied as untimely.

    **c.** If an expedited ruling is required, the moving party must specifically request an expedited schedule in the original motion and contact the Clerk of Courtroom 424 to advise of this request.

    **d.** Do not combine motions or combine your own motions with a response or reply.

    **e.** The requirements of C.R.C.P. 121(1-15) concerning the time for filing motions and the content and length of briefs will be strictly enforced. The Court may expedite the briefing schedule pursuant to C.R.C.P. 121(1-15) on its own motion, or by request of a party. The Court may rule on motions without a hearing pursuant to C.RC.P. 121, or the Court may order a hearing prior to trial.

6. **Service of Process**. Returns of Service on all defendants shall be filed within **63 days** after the date of the filing of the complaint. *See* C.R.C.P. 4(m)

7. **Default.** Application for default shall be filed **within 14 days** after default has occurred.

8. **Affirmative Defenses.** Please note the 2015 Comment to Rule 12: "The practice of pleading every affirmative defense listed in Rule 8(c), irrespective of a factual basis, is improper under C.R.C.P. 11(a).

9. **Trial Management Order**. The Trial Management Order must comply with the requirements of C.R.C.P. 16, as amended and **must be filed at least 28 days before trial**. All parties must participate in the preparation of the Trial Management Order. If a Trial Management Order is not filed in compliance with this Order, the Court may make further Orders to compel compliance.

10. **Discovery.** Discovery in all cases will be conducted subject to the provisions of the Court ordered Discovery Protocol attached.

## V.    **TRIAL PREPARATION CHECKLIST**

1. **Jury Instructions**.  Attorneys are required to meet and confer in good faith, preferably in person, regarding jury instructions.  The Court has already prepared the following instructions: 3:1, 3:4, 3:8, 3:9, 3:12, 3:14, 3:15, 3:16, 4:1, 4:2, 4:2A, 5:1 and 5:6.  Counsel for the plaintiff is required to submit a joint proposed initial draft of the final jury instructions directly to the court **via e-mail** to the Court's administrative assistants (02courtroom424@judicial.state.co.us) no later than **7 days prior to the scheduled pre-trial conference**.  By initial draft, the Court means a single document that includes the instructions the Court has already prepared; the instructions to which all parties have stipulated; and any additional or disputed instructions of any party, as discussed below. Please note:  the Court **does not** need, nor will it accept, basic introductory or closing instructions, oaths, admonitions, lengthy annotations, or like instructions.

Counsel shall submit instructions using the following order: opening instructions (the Court has already selected those); 2:1 claims and defenses; basic evidentiary instructions (the Court has already selected those); instructions relating to the plaintiff's claims; instructions relating to defenses; damages; definitions; closing instructions (the Court has already selected those).  An example of the instructions used by the Court may be found, in editable Word format, on the Colorado Judicial Branch website [www.courts.state.co.us] under the following links: *Courts; Second Judicial District; Judges and Staff; Martin F. Egelhoff; view more*.  **COUNSEL ARE STRONGLY ENCOURAGED TO USE THE INSTRUCTIONS ON THE WEBSITE AS A TEMPLATE WHEN PREPARING THE INITIAL DRAFT**; the initial draft submitted pursuant to this order shall be in substantial compliance with that format.

Unless a stipulation can be reached, counsel for both parties shall be responsible for submitting their own version of a proposed 2:1 instruction under the "Claims of the Parties" instruction, and the Court will either choose between those submitted instructions or prepare its own.  If counsel cannot agree on the wording of other instructions then both counsel shall submit instructions defining applicable stipulations, claims, standards of proof, affirmative defenses, damages, and special definitions under the appropriate sections.  Additional instructions may be submitted.  However the Court **does not** favor, and rarely gives, special instructions patterned after caselaw; any such instructions shall be submitted separately **via e-mail**, accompanied by a *brief* statement of authority, in compliance with the requirements for the initial draft.  All proposed instructions must be organized in substantial compliance with the format utilized by the Court.  If either counsel has an objection to a submitted instruction, the nature of the objection shall be *briefly* stated on the initial draft submitted to the Court, along with a *brief* statement of authority.

Counsel shall also submit proposed verdict forms that conform to the proposed instructions.

2. **Exhibit lists**. Each counsel shall prepare an index of exhibits that counsel expects to offer. The exhibit lists shall be submitted directly to the court **via e-mail** to the Court's administrative assistants (02courtroom424@judicial.state.co.us) **no later than 7 days prior to the scheduled pre-trial conference**. A sample Exhibit List may be found, in editable Word format, on the Colorado Judicial Branch website [www.courts.state.co.us] under the following links: *Courts; Second Judicial District; Judges and Staff; Martin F. Egelhoff; view more.* **COUNSEL ARE STRONGLY ENCOURAGED TO USE THE EXHIBIT LIST ON THE WEBSITE AS A TEMPLATE, AS EXHIBITS LISTS SUBMITTED PURSUANT TO THIS ORDER MUST BE IN SUBSTANTIAL COMPLIANCE WITH THAT FORMAT.** Exhibits shall be identified on the lists in accordance with paragraph 3, below.

3. **Witness lists and orders of proof**. Each counsel shall prepare a list of witnesses that will and may be called that the Court can read to the jury at the beginning of the trial. The list shall be in addition to any prior designation of witnesses. In addition to listing the names of the witnesses, the list may also specify the witnesses' title or degree and employment (e.g. Dr. Murray, M.D., Children's Hospital) but no other identifying information should be included (e.g. address, phone number etc.). Additionally, counsel **shall confer** and prepare a joint order of proof which identifies each counsel's good-faith estimate of the order in which witnesses will be presented and shall specify separately the time required for direct and cross-examination of each witness. The time estimates must include re-direct and re-cross examination. In no event may the cumulative time for witness examination exceed the time allocated for presentation of the trial; the total time allocation shall also account for the time necessary for jury selection, opening statements, regularly scheduled breaks, the jury instruction conference, and closing arguments. The Court reserves the right to enforce the time estimates stated in the order of proof. The witness lists and order of proof shall be emailed to the Court's Administrative Assistants (02courtroom424@judicial.state.co.us) no later than 7 **days prior to the scheduled pre-trial conference**.

4. **Exhibits**. All exhibits must be pre-marked. Plaintiffs will use numbers; defendants will use letters. Plaintiffs and defendants shall not mix numbers and letters, even for related exhibits (e.g. 1(a), 1(b), 1(c), etc.). The civil action number of the case should also be placed on each of the exhibit labels. Copies of exhibits must be exchanged as required by C.R.C.P. 16, and counsel shall determine whether an objection will be made as to the admissibility of the exhibit. Only where counsel has not had a reasonable opportunity to view an exhibit in advance will trial be interrupted for such a review.

5. **Depositions**. If counsel intends to use depositions in lieu of live testimony, said counsel must notify opposing counsel no later than 28 days prior to trial. Counsel must make objections to all or part of the offered deposition testimony no later than 14 days prior to trial and must cite page, line, and the specific evidentiary grounds supporting the objection. The same rules apply to both videotape and written

7

depositions. When applicable, counsel is required to provide someone to read testimony.

Original depositions will remain sealed until counsel request at trial that they be unsealed. Before trial begins, counsel must provide the Court with copies of all depositions likely to be used at the trial, as either direct evidence or impeachment.

6. **Audio-Visual Technology.** If counsel needs any form of audio-visual equipment, counsel must provide it.

7. **Trial Briefs.** Trial briefs may be filed. They should be concise and should not repeat previously filed pleadings or motions. Trial briefs must be filed no later than 7 days before the trial date and shall not exceed five pages in length.

8. **Juror Notebooks.** Each trial juror will be provided with a juror notebook. In each civil jury trial, there will be at least 1 alternate juror seated. The court will provide the one-inch binder notebooks, but the parties must prepare the contents. Each page must be three-hole punched in advance so it can be placed in a notebook and all exhibits must be tabbed so that the jurors can easily refer to them. All notebook materials must be submitted at the same time as jury instructions. No more than 50 pages per side shall be included in the juror notebooks without permission of the Court. All other exhibits shall be presented to the jury either by projector or other visual aids. Counsel must also provide three complete sets of exhibits, whether stipulated or not: 1 for the Court, 1 for the witness stand, and 1 for the use of the jury for exhibits that are not contained in the juror's notebooks.

   a. Copies of stipulated exhibits may be put in the juror notebooks before trial, subject to the limitations above. If exhibits are lengthy, stipulated excerpts may be used. Seven (7) copies of each exhibit shall be submitted, with three-hole punches, for the jury. If a party wants a copy of an exhibit in the juror notebooks (subject to the page limitations above) and the parties have not stipulated to its inclusion, the party should bring to trial seven (three hole-punched) copies of the exhibit; copies will be placed in the notebook if and when the exhibit is admitted, along with the tabs for the exhibit.

   b. If there are any scientific or other specialized terms which will be used repeatedly, those should be set forth, with an agreed-upon definition. If the parties have a legitimate dispute about the definition of any term, just the term should be listed.

VI. **CONDUCT OF THE TRIAL**

   1. **Scheduling/Use of Time.**

8

a. The trial day will start at 8:30 a.m. and end at 5:00 p.m. There will be a morning and an afternoon break of 15 to 20 minutes each. Lunch will normally run from approximately noon to 1:00 or 1:30 p.m.

b. Counsel and parties will be in court by 8:00 a.m. on the first day of trial and 8:15 a.m. thereafter so that counsel may discuss anything with the Court that needs to be dealt with before the trial begins.

c. It is the obligation of counsel to have witnesses scheduled to prevent any delay in the presentation of testimony or running out of witnesses before 5:00 p.m. on any trial day. Accordingly, there shall be no more than five minutes delay between witnesses. Counsel should not expect the Court to take lengthy recesses or otherwise unduly interrupt the trial because of scheduling issues with witnesses. Failure to have witnesses available may result in a party being required to call witnesses out of order or rest prematurely.

2. **Jury Selection**

a. Each side will normally have 30 minutes for *voir dire,* unless additional time is requested and permitted in advance of the first day of trial. In multi-party cases, time must be divided between all parties on one side of the case.

b. *Voir dire* will be conducted from the podium.

c. For most trials, there will be one alternate juror seated, but for lengthier trials, the Court may seat two alternate jurors. The Court will advise counsel on the first day of trial how the alternate will be designated.

c. Normally, challenges for cause will be exercised at the bench upon the conclusion of all parties' voir dire. Preemptory challenges will be announced orally in open court and indicated on the list of jurors remaining.

3. **Opening Statements**. The Court generally does not limit the time for opening statements. However, opening statements in excess of 30 minutes are strongly discouraged; the Court may terminate an opening statement longer than that or which is repetitive or argumentative.

4. **Questioning Witnesses**. Because the Court utilizes FTR, all questioning must be done from the podium. If counsel arrange for a court reporter, the Court will address this issue prior to the commencement of trial.

5. **Closing Arguments**. The Court may impose limits on closing argument. In multiple-party cases, this time may be divided between the parties.

9

6. **Proposed Findings of Fact and Conclusions of Law**.  For court trials, counsel should be prepared to file Proposed Findings of Fact and Conclusions of Law upon the conclusion of the presentation of evidence.  The proposed factual findings shall be specific and supported by evidence elicited at trial.

7. **Withdrawal of Exhibits**.  Because this courtroom no longer has a court reporter and because of a reduced work force in the clerk's office, the court will no longer maintain custody of exhibits at the conclusion of a trial or hearing.  Unless all parties agree on the record that exhibits need not be maintained, the following procedure will be followed:

   a. When the trial or hearing is concluded, each party will withdraw any exhibits or depositions which that party marked and/or admitted, whether or not admitted into evidence;

   b. Each party will maintain in its custody the withdrawn exhibits and/or depositions without modification of any kind until sixty days after the time for the need of such exhibits for appellate or other review purposes has expired, unless all parties stipulate otherwise on the record or in writing.  It will be the responsibility of the withdrawing parties to determine when the appropriate time period has expired.

VII.  **SETTLEMENT**

The parties are to **notify the Court within 24 hours of settlement or resolution of the case.  All documents confirming settlement shall be filed not later than 14 days from the date of settlement**, unless otherwise ordered by the Court.  The Court will not vacate or continue any previously scheduled trial in anticipation of resolution.

VIII.  **GENERAL RULES**

   1. This Order shall apply to pro se parties.

   2. Counsel for the plaintiff or the pro se plaintiff shall send copies of this order to all future counsel/parties in this case, except where the Court has e-filed this Order to the parties.  A certification of compliance with this portion of the Order shall be filed.

   3. This Pre-Trial Order applies to **ALL** cases without exception and supersedes any prior pre-trial order that may have issued.  Counsel are expected to familiarize themselves with the provisions of this order.  Failure to comply with this Order will not be excused due to lack of familiarity with the requirements set forth herein.

Dated: October 11, 2024

BY THE COURT:

10

Martin F. Egelhoff
District Court Judge

## DISCOVERY PROTOCOL

Counsel are reminded that all discovery responses shall be made in the spirit and with the understanding that the purpose of discovery is to elicit facts and to get to the truth. The Rules of Civil Procedure are directed toward securing a just, speedy and inexpensive determination of every action. The discovery process shall not be employed to hinder or obstruct these goals nor to harass, unduly delay or needlessly increase the cost of litigation.

## WRITTEN DISCOVERY

These discovery protocols shall be considered as part of the responsibility of parties and counsel to comply with the Rules of Civil Procedure relating to discovery.

1. The parties should refrain from interposing repeated boilerplate type objections such as "overbroad, unduly burdensome, vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence" and other similar objections. In the event any such objections are made, they shall be followed by a clear and precise explanation of the legal and factual justification for raising such an objection. Additionally, if the objecting party otherwise responds to the discovery request but does so subject to or without waiving such an objection, that party shall describe with reasonable specificity the information which may be available but which is not being provided as a result of the objection raised.

2. When a responding party claims not to understand either a discovery request or the meaning of any words or terms used in a discovery request, that party shall, within fourteen (14) days of receiving the discovery request, seek clarification of the meaning from counsel who served the discovery. A failure to seek such clarification shall be considered a violation of this Order for Discovery Protocol.

3. A discovery response which does not provide the information or material requested but promises to do so at some point in the future will be treated as the equivalent of no response unless the party so responding provides a specific reason for the information not being produced as required by the Rules of Civil Procedure, and also provides a specific date by which such information will be produced.

4. A response to a discovery request that does not provide the information or material requested but rather states that the party is continuing to look for or search for such information or material will be treated as the same as no response unless that party provides a clear description of where such information or material is normally located, who is normally in custody of such information or material, where the party has searched, the results of the search, as well as the identity of all persons who have

12

engaged in such a search. The responding party shall also provide a clear explanation of the ongoing search and a specific date by which the search will be complete.

5. Whenever a party objects to discovery based upon a claim of attorney/client privilege, work product protection or any other privilege or protection, that party shall produce a detailed privilege/protection log that includes at least the following for each such item for which privilege is claimed:

    a. The information required by C.R.C.P. 26(b)(5);

    b. The date of the information or material;

    c. All authors and recipients; and

    d. The specific privilege or protection which is claimed.

The proponent of the privilege has the burden of establishing that privilege. Failure to comply with this paragraph 5 and Order for Discovery Protocol will constitute a waiver of the claimed privilege.

## DEPOSITIONS

1. Depositions shall be conducted in compliance with the Colorado Rules of Civil Procedure.

2. During all depositions, counsel shall adhere strictly to C.R.C.P. 30(d) (1) and (3). No objections may be made, except those which would be waived if not made under C.R.C.P. 32(d)(3)(B) (errors, irregularities), and those necessary to assert a privilege, to enforce a limitation on evidence directed by the Court, or to present a C.R.C.P. 30(d)(3) motion (to terminate a bad faith deposition). Objections to form shall be stated: "Objection as to form." Any further explanation is inappropriate and prohibited unless specifically requested by the attorney asking the question.

3. There shall be no speaking objections. It is inappropriate and prohibited for an attorney, during the course of questioning, to advise a witness to answer "if you know," or "if you remember." It is similarly prohibited for an attorney during questioning to advise a witness not to speculate. All such questions shall be considered speaking objections. All deponent preparation shall be conducted prior to the commencement of the deposition and shall not take place during the course of the deposition.

4. It is appropriate for the deponent to request clarification of a question. However, it is not appropriate for counsel to do so.

13

5. A deponent and an attorney may not confer during the deposition while questions are pending. Similarly, neither a deponent nor counsel for a deponent may interrupt a deposition when a question is pending or a document is being reviewed, except as permitted by C.R.C.P. 30(d) (1).

6. Counsel shall refrain from excessive objections that have the purpose or effect of disrupting the flow of questioning or the elicitation of testimony.

7. Counsel may instruct the deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the Court, or to present a motion under paragraph 3 of C.R.C.P. 30(d). Whenever counsel instructs a witness not to answer a question, counsel shall state on the record the specific reason for such an instruction, the specific question, part of a question or manner of asking the question upon which counsel is basing the instruction not to answer the question.

8. Violations of these Discovery Protocols will result in the Court limiting or prohibiting additional discovery in the case.

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>October 11, 2024 12:24 PM<br>FILING ID: 24555457265A1<br>CASE NUMBER: 2024CV33128 |
| **Plaintiff:**<br><br>PERFORMANCE FOOD GROUP, INC. and WILLIAM MIKULKA<br>v.<br><br>**Defendants:**<br><br>SYSCO CORPORATION, SYSCO DENVER, INC., SYSCO NEW MEXICO USA, and SYSCO USA I, INC. | ↟ **COURT USE ONLY** ↟ |
| *Attorneys for Plaintiffs Performance Food Group, Inc. and William Mikulka*<br><br>Charles W. Weese, No. 32912<br>Jessica P. Marsh, No. 53473<br>WILLIAMS WEESE PEPPLE & FERGUSON PC<br>1801 California Street, Suite 3400<br>Denver, Colorado 80202<br>Telephone: (303) 861-2828<br>cweese@williamsweese.com<br>jmarsh@williamsweese.com<br><br>Yasser A. Madriz*<br>Meghaan C. Madriz*<br>Miles O. Indest*<br>Sarah Holub*<br>MCGUIREWOODS LLP<br>845 Texas Avenue, Suite 2400<br>Houston, Texas 77002<br>Telephone: (832) 255-6361<br>ymadriz@mcguirewoods.com<br>mmadriz@mcguirewoods.com<br>mindest@mcguirewoods.com<br>sholub@mcguirewoods.com<br>*(pro hac vice application forthcoming)* | Case No. _____<br><br><br>Division/Courtroom: _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Performance Food Group, Inc. ("PFG") and William Mikulka ("Mikulka") (collectively, "Plaintiffs") bring this declaratory judgment action against Defendants Sysco Corporation ("Sysco"), Sysco Denver, Inc. ("Sysco Denver"), Sysco New Mexico, LLC ("Sysco New Mexico") and Sysco USA I, Inc. (collectively, "Defendants") and respectfully seek a declaration that certain restrictive covenants are unlawful and unenforceable under Colorado Revised Statutes § 8-2-113 and other controlling Colorado authority or law.

## INTRODUCTION

1.      Pursuant to Colorado Revised Statutes § 8-2-113(7) and Colorado Rule of Civil Procedure 57, Plaintiffs seek a declaratory judgment finding that the non-compete and non-solicitation covenants found in the operative Sysco Protective Covenants Agreement entered into between Mikulka and Defendants on October 3, 2022[1] (the "Agreement") are void or otherwise unenforceable under applicable Colorado law.

2.      On July 10, 2023, Defendants terminated Mikulka, who was serving as Region President of the Southern Rockies, which encompasses Sysco Denver and Sysco New Mexico, without cause. More than a year later, Mikulka accepted an offer of employment to work for PFG. Mikulka's official start date with PFG is set for October 13, 2024. Plaintiffs now seek a declaration that the non-compete and non-solicitation provisions in the Agreement that Defendants drafted, imposed on, and intends to enforce against Mikulka are unlawful restrictive covenants that are void under Colorado Revised Statutes § 8-2-113.

---

[1] As discussed herein, Mikulka accepted various Sysco Protective Covenants Agreements during his employment with Defendants; however, Plaintiffs maintain that the last accepted Sysco Protective Covenants Agreement by Mikulka— i.e., the "Agreement" as defined herein—superseded all prior versions and, thus, is the only operative agreement between Mikulka and Defendants.

3.      Generally, Colorado Revised Statutes § 8-2-113 provides that "any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void." Further, even where the limited exceptions outlined in § 8-2-113 apply, a restrictive covenant is nonetheless found to be void where the employer fails to provide the requisite notice of such covenants as set forth in the applicable version of the statute. *See* COLO. REV. STAT. ANN. § 8-2-113(4). Finally, a restrictive covenant will nonetheless be found unenforceable when it is unreasonable in scope.

4.      Because (i) the non-compete and non-solicitation covenants in the Agreement do not fall within the limited exceptions to the general statutory prohibition on restrictive covenants, (ii) Defendants failed to provide the requisite notice of such covenants under the Colorado statute, and (iii) the restrictive covenants are not reasonable in scope or geographic limitation, Plaintiffs respectfully request that this Court: (1) declare that, pursuant to Colorado Revised Statutes § 8-2-113, the restrictive covenants in the Agreement are unlawful, invalid, void, and unenforceable; and (2) enjoin Defendants from using, enforcing, or attempting to enforce those restrictive covenants against Mikulka (whether in his employment with PFG or otherwise).

**PARTIES**

5.      PFG is a Colorado corporation with its principal place of business and corporate headquarters in Richmond, Virginia.

6.      Mikulka is an individual presently residing in Douglas County, Colorado.

7.      Sysco is a Delaware corporation with its principal place of business located in Houston, Texas. Sysco is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies

and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout Colorado. It may be served through its registered agent, Corporation Service Company, at 1900 W. Littleton Boulevard, Littleton, CO 80120.

8.       Sysco Denver is a Colorado corporation with its principal place of business located in Denver, Colorado. Sysco Denver is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout Colorado. It may be served through its registered agent, Capitol Corporate Services, Inc., at 36 South 18th Ave., Ste. D, Brighton, CO 80601.

9.       Sysco New Mexico is a Delaware corporation with its principal place of business located in Albuquerque, NM. On information and belief, Sysco New Mexico regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants. It may be served through its registered agent, Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, NM 87501.

10.      Sysco USA I, Inc. is a Delaware corporation with its principal place of business located in Houston, Texas. Sysco USA I, Inc. is registered and/or licensed to do business in Colorado, regularly and purposefully conducts business in Colorado, either directly or through its operating companies and/or subsidiary or affiliated entities, including without limitation the other Defendants, and maintains multiple business offices from which it transacts business throughout

4

Colorado. It may be served through its registered agent, Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to Colorado Revised Statutes § 8-2-113(7), which states that "[a] worker who is a party to a covenant not to compete, or a subsequent employer that has hired or is considering hiring the worker, may seek a declaratory judgment from a court of competent jurisdiction or an arbitrator that the covenant not to compete is unenforceable." Under Colorado law, "[d]istrict . . . courts within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." C.R.C.P. 57; *see also* COLO. CONST. ART. VI, § 9 ("The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil . . . . cases.").

12.     This Court may exercise jurisdiction over Defendants because this action arises from Defendants' transaction of business within Colorado. *See* COLO. REV. STAT. ANN. § 13-1-124(1)(a).

13.     This Court is the proper venue to try this action because it is the Court embracing the county in which Sysco Denver resides and the county in which Defendants may be found in this state.[2] *See* C.R.C.P. 98(c)(1).

---

[2] According to documents on file with the Colorado Secretary of State ("SOS"), Sysco Denver maintains its principal office at 5000 Beeler Street, Denver, CO 80238. However, to the extent Sysco Denver was merged into and changed its name to Sysco USA I, Inc., as indicated by the documents on file with the Colorado SOS, then Sysco USA I, Inc. is a nonresident of Colorado—as a Delaware corporation with its principal place of business in Houston, Texas—but can be found at its operational facilities located at 5000 Beeler Street, Denver, CO 80238.

**FACTS**

**A. Mikulka's Role with Defendants.**

14.    Defendants consider themselves to be the "global leader" in selling, marketing, and distributing food products to restaurants, healthcare and education facilities, lodging establishments, and other customers, as well as providing equipment and supplies for the food service and hospitality industries.[3] Defendants' network consists of more than 76,000 colleagues, 340 distribution facilities worldwide, and approximately 730,000 customer locations served. On their website, Defendants boast more than $78 billion of sales generated for the fiscal year 2024.

15.    Mikulka became an employee of one or more of Defendants in April of 2014. Defendants initially hired Mikulka as a Senior Vice President of Operations for Sysco in Chicago, Illinois. He was next promoted to Executive Vice President in Seattle, Washington and then President of Sysco Las Vegas.

16.    Then, in July 2016, Defendants moved Mikulka to President of Sysco Denver, and Mikulka relocated his entire family to Colorado.

17.    In September of 2020, Defendants consolidated its operating companies, leading to a major reduction in force among operating company presidents. Mikulka survived this reorganization and took over as Region President of the Southern Rockies, overseeing both Sysco Denver and Sysco New Mexico.

18.    During his tenure as Region President of the Southern Rockies, Mikulka's geographic territory of responsibility encompassed portions of Colorado[4], all of New Mexico, and

---

[3] *See* https://www.sysco.com/about/company-profile/our-purpose (last visited October 10, 2024).
[4] Mikulka's Colorado territory did not include the Western Slope, Grand Junction, Western Colorado, and parts of Southwest Colorado.

portions of West Texas. Mikulka oversaw two distribution centers—one in Denver, Colorado and

one in Albuquerque, New Mexico—both of which were within Defendants' broadline[5] business.

Mikulka also was generally responsible for sales and operations, profit and loss reporting and

accountability, finances and, to a degree, human resources for his territory.

## B. Defendants Required Mikulka to Accept Multiple Versions of the SPCA, Each Superseding the Next.

19.     In connection with his above-described employment with Defendants, and in order

to receive certain equity or quasi-equity grants from Defendants during his employment, Mikulka

was required to electronically accept the terms of Defendants' Sysco Protective Covenants

Agreement ("SPCA(s)"), which were updated and superseded each year with new iterations.

20.     Relevantly, on September 13, 2020, shortly after Mikulka became Region President

of the Southern Rockies, Mikulka was required to electronically accept the terms of the August

2020 version of the SPCA. (*See* August 2020 SPCA, attached hereto as <u>Exhibit 1</u>.)[6] Then, on

September 17 and 19, 2021, Mikulka electronically accepted the August 2021 version of the

SPCA. (*See* August 2021 SPCA, attached hereto as <u>Exhibit 2</u>.)[7]  Finally, on September 27, 2022

---

[5] Defendants' broadline operating companies distribute a full line of food products and a wide variety of non-food products to independent and chain restaurant customers, healthcare facilities, and educational facilities. *See* https://www.sysco.com/about/company-profile/the-sysco-story (last visited October 10, 2024).

[6] Mikulka accepted four separate copies of the August 2020 SPCA in association with various equity grants received from Defendants. The four copies were all executed on September 13, 2020 within minutes of each other and substantively identical. Plaintiffs have attached as an exhibit to this Complaint only one copy for this Court's review but can provide this Court the additional accepted copies if necessary.

[7] Again, Mikulka accepted four separate copies of the August 2021 SPCA in association with various equity grants received from Defendants. Mikulka accepted the August 2021 SPCAs on September 17, 2021 and September 19, 2021, but, again, the copies were substantively identical. Plaintiffs have attached as an exhibit to this Complaint a copy of one of the August 2021 SPCAs accepted on September 19, 2021 but can provide this Court the additional accepted copies if necessary.

and October 3, 2022,[8] Mikulka electronically accepted the operative Agreement: the August 2022 version of the SPCA last accepted by Mikulka on October 3, 2022. (*See* October 3, 2022 Agreement, attached hereto as Exhibit 3.)

21.    The Agreement superseded all prior SPCAs accepted by Mikulka. Specifically, Section 5 of the Agreement expressly confirmed that it "contains the parties entire agreement concerning the matters covered in it." (*Id.* at § 5.) Further, Defendants' intention that the Agreement act as a novation is clear based on the fact that the Agreement covers all the terms of prior SPCA versions, but endeavors to update the terms therein to comply with recent updates in the law. Indeed, the Agreement was accepted after amendments to Colorado Revised Statutes § 8-2-113 became effective on August 10, 2022.

## C. The Amended Colorado Non-Compete Statute Imposed New Requirements for Employers in Colorado.

22.    Colorado Revised Statutes § 8-2-113, which was amended effective as of August 10, 2022, is Colorado's statute governing, among other topics, the enforcement of non-compete, customer non-solicitation, and employee confidentiality covenants in the State of Colorado. The amended statute provides for Colorado's general prohibition of non-compete covenants in the employment context, by stating: "Except as provided in subsections (2)(b) and (3) of this section, any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void." COLO. REV. STAT. ANN. § 8-2-113(2)(a). In other

---

[8] Again, Mikulka accepted four substantively identical copies of the August 2022 SPCA in association with various equity grants received from Defendants. As noted above, two copies were accepted on September 27, 2022 and the final two SPCAs were accepted on October 3, 2022. Plaintiffs have attached as an exhibit to this Complaint the last electronically accepted August 2022 SPCA by Mikulka – the Agreement accepted on October 3, 2022. Plaintiffs can provide this Court the additional accepted copies if necessary.

words, apart from the limited exceptions outlined in the statute, non-compete covenants between

employers and employees are void under Colorado law.

23.    The enumerated statutory exceptions allow for a non-compete covenant between

an employer and employee in Colorado if the employee "earns an amount of annualized cash

compensation equivalent to or greater than the threshold amount for highly compensated workers,

if the covenant not to compete is for the protection of trade secrets and is no broader than is

reasonably necessary to protect the employer's legitimate interest in protecting trade secrets."

COLO. REV. STAT. ANN. § 8-2-113(2)(b).

24.    The statutory prohibition against covenants not to compete does not apply to a

covenant not to solicit customers governing a person who, at the time the covenant is entered into

and at the time it is enforced, earns an amount of annualized cash compensation equivalent to or

greater than sixty percent of the threshold amount for highly compensated workers, if the non-

solicitation covenant is no broader than reasonably necessary to protect the employer's legitimate

interest in protecting trade secrets. COLO. REV. STAT. ANN. § 8-2-113(2)(d).  Accordingly, in order

for an employer, like Defendants, to enforce a non-compete or customer non-solicitation covenant

against a Colorado employee (or former employee) under the amended Colorado statute, the

covenants must be designed to protect the employer's trade secrets.

25.    The Colorado statute further provides that a reasonable confidentiality provision is

not prohibited by the statute, if certain conditions are met, as follows: (i) it is "relevant to the

employer's business;" and (ii) it "does not prohibit disclosure of information that arises from the

worker's general training, knowledge, skill, or experience, whether gained on the job or otherwise,

information that is readily ascertainable to the public, or information that a worker otherwise has

a right to disclose as legally protected conduct." COLO. REV. STAT. ANN. § 8-2-113(3)(b).

26.     The amended Colorado statute also imposes a notice requirement on employers for

non-compete and customer non-solicitation covenants not to be void and unenforceable.   The

notice requirement, required for all non-compete and customer non-solicitation covenants entered

into on or after the effective date of the amended statute (*i.e.*, August 10, 2022), provides, in

relevant part:

> Any covenant not to compete that is otherwise permissible under subsection (2) or
> (3) of this section is void unless notice of the covenant not to compete and the terms
> of the covenant not to compete are provided to: . . .(II) A current worker at least
> fourteen days before the earlier of: (A) The effective date of the covenant; or (B)
> The effective date of any additional compensation or change in the terms or
> conditions of employment that provides consideration for the covenant.

COLO. REV. STAT. ANN. § 8-2-113(4)(a).  Subsection (2) of the statute addresses non-compete and

customer non-solicitation covenants while subsection (3) of the statute addresses, among other

items, confidentiality/non-disclosure covenants and sale of business non-compete covenants.

27.     The statute requires an employer to provide the above notice "in a separate

document from any other covenants between the worker and employer and in clear and

conspicuous terms in the language in which the worker and employer communicate about the

worker's performance." COLO. REV. STAT. ANN. § 8-2-113(4)(b). The notice must be signed by

the employee. *Id.*

28.     The statute further states that an employer satisfies the notice requirement when the

notice is provided with a copy of the agreement containing the non-compete covenant, identifies

the agreement by name and states that the agreement contains a non-compete covenant that could

restrict the employee's options for subsequent employment following his separation, and directs

the employee to the specific sections or paragraphs of the agreement that contain the non-compete

covenant. COLO. REV. STAT. ANN. § 8-2-113(4)(d).

### D. The Restrictive Covenants in the Agreement are Void and Unenforceable under Colorado Law.

29.     In feigned compliance with the 2022 statutory amendments, Defendants updated

the Agreement in 2022 to contain a section specific to Colorado employees that tracks *some* of the

language of the revised Colorado Revised Statutes § 8-2-113, as follows:

> To the extent Associate works for the Company in the State of Colorado (or last worked for the Company in the State of Colorado, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Section 3.3 only applies if Associate earns at least 60% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (b) Section 3.4 only applies if Associate earns at least 100% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (c) Associate has at least fourteen (14) days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily; and (d) Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Sections 3.3 or 3.4 of this Agreement.

(Exhibit 3 at § 3.17.)

30.     However, the Agreement and, specifically, the Unauthorized Use or Disclosure,

Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer

Relationships, and Restriction on Unfair Competition provisions, in Sections 2.2, 3.2, 3.3, and 3.4,

respectively, of the Agreement (collectively, the "Restrictive Covenants"), are void and

unenforceable pursuant to the express statutory language of Colorado Revised Statutes § 8-2-113

for multiple reasons, including that: (i) the Agreement—and thus the Restrictive Covenants—are

broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade

11

secrets; (ii) the Unauthorized Use or Disclosure provision is not reasonable; and (iii) to the extent

the Restrictive Covenants fall within the limited exceptions set forth in Colorado Revised Statutes

§ 8-2-113, Mikulka was not provided the requisite notice of the covenants not to compete and not

to solicit customers.

31.     First, the Agreement expressly seeks to protect Defendants' "Confidential

Information (as defined below), inventions and discoveries, specialized training, and its customer

relationships and other goodwill." (Exhibit 3 at p. 1.) When providing a definition of "Confidential

Information," the Agreement expressly notes that "Confidential Information includes trade secrets,

but an item of Confidential Information *need not qualify as a trade secret to be protected by this

Agreement.*" (*Id.* at § 2.1 (emphasis added.)) Thus, the Agreement—and the Restrictive Covenants

therein—are "broader than reasonably necessary to protect [Defendants'] legitimate interest in

protecting their *trade secrets*" and are therefore void. *See* COLO. REV. STAT. ANN. §§ 8-2-

113(1)(b); (2)(b); (2)(d).

32.     To the extent the Agreement subsequently attempts to limit the Restriction on

Interfering with Customer Relationships and Restriction on Unfair Competition "only to the extent

reasonably necessary to protect the [Defendants'] legitimate interest in protecting trade secrets" in

the Colorado-specific provision in Section 3.17 of the Agreement, Defendants—at best—create an

ambiguity in terms of the scope of the Agreement and what the covenants are designed to protect.

33.     Second, the Unauthorized Use or Disclosure provision in Section 2.2 of the

Agreement is not a "reasonable confidentiality provision." COLO. REV. STAT. ANN. § 8-2-

113(3)(b). Specifically, to the extent the provision fails to exclude from its definition of

"Confidential Information" any information that arises from Mikulka's "general training,

knowledge, skill, or experience, whether gained on the job or otherwise," and thus prohibits such information's use, the provision is void under Colorado law. *Id.* Indeed, as further discussed below, the definition of "Confidential Information" expressly includes "know-how" and "problem-solving techniques"—information that would certainly arise from Mikulka's general training, knowledge, skill, and experience. (*See* Exhibit 3 at § 2.1.)

34. Third, the Agreement spans thirteen pages and contains several other restrictive covenants between Defendants and Mikulka—including post-employment non-compete and customer non-solicitation covenants.[9] Specifically, the "Protective Covenants" section contains a Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer Relationships, and Restriction on Unfair Competition—as well as several, state-specific restrictive covenant provisions. (*Id.* at § 3.) Given such covenants' inclusion in the Agreement, Defendants were required to comply with the notice requirements of Colorado Revised Statutes § 8-2-113(4).

35. Even if the Restrictive Covenants fell within the limited exceptions to Colorado's general prohibition on covenants not to compete, Defendants plainly failed to provide Mikulka notice of the non-compete and customer non-solicitation covenants in the Agreement in a separate document from any other covenants between Mikulka and Defendants. COLO. REV. STAT. ANN. § 8-2-113(4)(b). Rather, the only notice provided to Mikulka was in the Agreement itself in the Colorado-specific provisions of Section 3.17. This notice failed to comply with the plain statutory requirements. Moreover, because Defendants failed to provide notice in a separate document from the Agreement, no notice was signed by Mikulka, as required by the statute.

---

[9] In addition to the "Protective Covenants" section, the Agreement includes sections discussing Mikulka's "Position of Trust" and his common law or statutory obligations with respect to his "Duty of Loyalty and Conflicts of Interests," as well as a section setting forth Mikulka's agreements with respect to the unauthorized use or disclosure of Confidential Information, as defined therein, recordkeeping, computer use, and mobile devices. (Exhibit 3 at §§ 1-2.)

36.     Further, the Agreement contains a "Clarification of Restrictions" section that requires an employee to seek clarification in writing from an authorized representative or otherwise waive the right to later claim confusion over the scope or application of any restrictions therein. (Exhibit 3 at § 3.5.) This provision was seemingly included in acknowledgment that the terms of the Restrictive Covenants are not clear and conspicuous. *See* COLO. REV. STAT. ANN. § 8-2-113(4)(b). Thus, even if Section 3.17 satisfies the requirement to provide Mikulka notice of the restrictive covenants, which Plaintiffs deny, the Agreement itself does not contain clear and conspicuous terms, thereby nullifying the notice and failing to satisfy the statutory notice requirements.

37.     Finally, despite purporting to provide a fourteen-day notice period to Mikulka—or otherwise requiring Mikulka to agree to waive Defendants' obligation to provide such notice—the Agreement expressly states that it is "AGREED to and effective as of the date of Associate's electronic acknowledgment." (Exhibit 3 at p. 13.) Defendants, therefore, did not comply with the fourteen-day notice requirement of the statute for current employees. *See* COLO. REV. STAT. ANN. § 8-2-113(4)(a). Accordingly, the Restrictive Covenants are void for failure to provide notice as required under Colorado law.

**E. The Restrictive Covenants in the Agreement Contain Overbroad Definitions and are Unreasonable in Scope.**

38.     Even if the Agreement is not deemed void based on the preceding, the non-compete and non-solicitation covenants are overbroad, unreasonable, and, thus, unenforceable.

39.     Specifically, for a period of two years following the end of his employment with Defendants, Section 3.3 of the Agreement provides that Mikulka "will not, directly or indirectly, personally or through others, solicit or communicate (regardless of who initiates the

14

communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy a Conflicting Product or Service from or otherwise refer a Covered Customer to a Competitor." (Exhibit 3 at § 3.3.) A "Covered Customer" is defined in the Agreement as:

> [A] Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the "**Look Back Period**"): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to *by another Company associate* whom Associate directly or *indirectly supervised*, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) Associate *learned Confidential Information about*. A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(*Id.* at § 3.1(a) (emphasis added).)

40. As mentioned above, the term "Confidential Information" in the Agreement goes well beyond trade secrets and instead encompasses "an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use." (*Id.* at § 2.1.) Further, while the Agreement provides examples of the various types of information it purports to be "Confidential Information," the Agreement broadens the scope of the term by clarifying that the definition "includes, *but is not limited to*" those examples. (*Id.* (emphasis added).) Yet, the examples themselves are sufficiently vague to render the definition overbroad, including items such as "internal reports," "internal business-related communications," "methods," "techniques," "know-how," "patterns," "processes," and "problem-solving techniques." (*Id.*)

41. Thus, the Restriction on Interfering with Customer Relationships—i.e., the Agreement's customer non-solicitation covenant—in Section 3.3 of the Agreement is overbroad and unenforceable because the definition of "Covered Customers" would include customers of Mikulka's *indirect subordinates* and any customer that Mikulka learned *any information about* that falls within the very vague and broad definition of Confidential Information.

42. To put the scope of this provision in perspective, Mikulka's indirect subordinates included approximately 840 individuals and more than 1,000 customers would arguably be considered "Covered Customers" with respect to Mikulka based on his role as a regional President and the types of information to which he had access.

43. Further, for the same two-year period following Mikulka's termination of employment, the Agreement contains a non-compete covenant, providing, in relevant part, that Mikulka will not:

> [A]ccept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, *or learned Confidential Information* about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has engaged in material business activities for Company in person, by phone or other remote means, or through correspondence during the Look Back Period; (ii) all states, provinces, counties, boroughs, or parishes included within any geographical region or market that Associate directly or indirectly serviced or managed on behalf of Company during the Look Back Period; (iii) *any state, county, borough, parish or other geographic region as to which Associate had access to Confidential Information during the Look Back Period*; and (iv) *any state, county, borough, parish or other geographic region in which the Associate's Business Unit conducted business during the Look Back Period.* **"Business Unit"** means the business segment which *Company* was a part of during the Look Back Period . . ."

(*Id.* at § 3.4 (emphasis added).)

16

44.    Again, given the inclusion of the broadly defined terms and expansive language, the Restriction on Unfair Competition—*i.e.*, the Agreement's non-compete covenant—in Section 3.4 of the Agreement is overbroad and unenforceable. First, the non-compete covenant's activity prohibition is not limited to the same or similar work Mikulka actually performed in his last role with Defendants, but instead includes any activities or services that are the same as or similar to those Mikulka "learned Confidential Information about" during the last two years of his employment. (*Id.*) This restriction, in essence, means that Mikulka is prohibited from working for a "Competitor" in any capacity—whether as an executive, regional president, truck driver, butcher, or janitor.

45.    Second, and similar to the activity restriction, the geographic scope of the non-compete purports to encompass any territory as to which Mikulka "had access to Confidential Information" during the last two years of his employment with Defendants. (*Id.* at § 3.4(iii).) As discussed above, given the boundless and vague definition of "Confidential Information," this restriction is overbroad in that it would include any territory as to which Mikulka had access to *any* Sysco information, regardless of the true confidential or trade secret nature of the information or extent of his actual knowledge. Theoretically, if Mikulka received an email during the last two years of his employment about Sysco's operations outside of his geographic territory, his receipt of such email would prohibit him from working for a competitor in the geographic areas to which the email related. Subsection (iii) of the "Restricted Area" definition, therefore, makes the non-compete covenant apply nationwide—or even globally. Similarly, the "Restricted Area" definition improperly includes any territory as to which Mikulka had access to—whether or not he, in fact, did access or learn—such Confidential Information.

46.      Further, the "Restricted Area" definition includes any territory that Mikulka's "Business Unit" conducted business, but the Agreement defines "Business Unit" as "the business segment which *Company* (i.e., Defendants) was a part of during the Look Back Period," not Mikulka. (*Id.* at § 3.4.) Thus, the "Restricted Area" for purposes of Mikulka's two-year non-compete covenant would span across *any territory* that Defendants conduct business—even if Mikulka himself did not conduct business in that particular region. Subsection (iv) of the "Restricted Area" definition, therefore, results in a global non-compete covenant.

47.      Additionally, both the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are overbroad because they rely on the defined term "Competitor." The Agreement defines a "Competitor" as any person or entity that directly or indirectly provides a "Conflicting Product or Service" to customers or prospective customers of Defendants. (*Id.* at § 3.1(c).) In turn, the Agreement defines "Conflicting Product or Service" as any product and/or service that Mikulka was provided Confidential Information about during the two years preceding Mikulka's termination, including products and services merely under development during that time. (*Id.* at 3.1(b).) Examples of "Conflicting Product or Services" include, *but are not limited to*:

> The negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(*Id.*)

18

48.     Thus, to the extent Defendants provided Mikulka with any information related to any of its developed or undeveloped food or "nonfood" products—ranging from medical and surgical supplies to hotel and motel textiles—the customer non-solicitation covenant and non-compete covenant's use of the term "Competitor" in Sections 3.3 and 3.4, respectively, of the Agreement essentially ban Mikulka from being employed in virtually any industry that even remotely relates to food. Illustratively, if this Court were to enforce the Restrictive Covenants as written in the Agreement, Mikulka would be prohibited from seeking employment with Costco, Walmart, H-E-B, Ikea, 7-Eleven, Nordstrom's, or even the Dollar Store, to name a few—all companies that are not considered competitors of Defendants.

49.     Finally, the Restriction on Interfering with Employee Relationships in Section 3.2 of the Agreement is overbroad and unenforceable given its application to all of Defendants' employees, as opposed to the employees that Mikulka supervised or worked with during the last two years of his employment. According to Sysco's LinkedIn page, Sysco has more than 74,000 colleagues—all of which Mikulka is prohibited from not just soliciting or encouraging to leave Defendants, but even from identifying or evaluating for potential recruitment away from Defendants. The employee non-solicitation covenant, therefore, serves no legitimate business interest given its excessive scope.

**F.  Additionally—and Alternatively—the Preceding SPCAs are Likewise Overbroad and Unenforceable.**

50.     In the event this Court were to find that the Agreement does not supersede all prior versions of the SPCA, the August 2020 SPCAs and August 2021 SPCAs accepted by Mikulka (the "Preceding SPCAs") featured many of the same broadly defined terms and were similar in

19

overbroad scope as the Agreement. Accordingly, the non-compete and non-solicitation covenants in the Preceding SPCAs are similarly unenforceable. (*See* <u>Exhibits 1 and 2</u>.)

51.     Specifically, the Preceding SPCAs' Restriction on Interfering with Customer Relationships and Restriction on Unfair Competition incorporate the defined terms of "Confidential Information," "Covered Customer," "Conflicting Product or Service," and/or "Competitor." (*See* <u>Exhibits 1 and 2</u> at §§ 3.3, 3.4.) "Confidential Information" is again boundlessly defined, with vague examples like "techniques" and "know how." (<u>Exhibits 1 and 2</u> at § 2.1.) A "Covered Customer" is again defined to include those customers that were serviced or sold to by a company associate that Mikulka *indirectly* supervised as well as those customers Mikulka "learned confidential information about." (<u>Exhibits 1 and 2</u> at § 3.1(a).) Notably, the definition of "Covered Customer" in the Preceding SPCAs is even more vague than the same defined term in the Agreement, given that it fails to use the defined term "Confidential Information." Rather, the definition uses the undefined (lowercase) term "confidential information." (<u>Exhibits 1 and 2</u> at § 3.1(a).) Finally, the term "Competitor" in the Preceding SPCAs similarly defines the term as those entities in a line of business that involves providing a "Conflicting Product or Service," which again includes any products and services that Mikulka was involved in or was provided "Confidential Information" about, including food or non-food related products. (<u>Exhibits 1 and 2</u> at § 3.1(b).)

52.     Accordingly, the Preceding SPCAs' Restrictions on Interfering with Customer Relationships (in Section 3.3) are overbroad and unenforceable because they purport to prohibit Mikulka from soliciting or communicating with any "Covered Customer"—regardless of whether Mikulka himself had a business relationship with that customer or learned trade secret information

20

about such customer—or from referring a Covered Customer to a Competitor or Conflicting Product or Service. Again, given the broad definitions used, this covenant can be read to encompass thousands of customers, all of Defendants' food and non-food product offerings, and companies that are not actual competitors of Defendants.

53.     Similarly, the Preceding SPCAs' Restrictions on Unfair Competition (in Section 3.4), which prohibit Mikulka from accepting employment with a "Competitor," prohibit Mikulka from an overbroad range of employment with any entity whose business has some relation to food or non-food related products. Specifically, pursuant to the lines of business the Agreement deems to be a "Conflicting Product or Service," Mikulka is prohibited from seeking employment with entities in a business related to the "food or related nonfood products" distributed by Defendants to restaurants, healthcare and educational facilities, lodging establishments "or other similar customers." (Exhibits 1 and 2 at 3.1(b).) Further, the non-compete covenant's activity prohibition is not limited to the same or similar work Mikulka actually performed in his last role with Defendants, but instead includes any activities or services that are the same as or similar to those Mikulka "learned Confidential Information about" during the last two years of his employment. (Exhibits 1 and 2 at § 3.4.) As discussed above, this restriction means that Mikulka is prohibited from working for a "Competitor" in any capacity.

54.     The Preceding SPCAs' Restrictions on Interfering with Employee Relationships (in Section 3.2) are also overbroad and unenforceable given their application to all of Defendants' employees, as opposed to the employees that Mikulka supervised or worked with during the last two years of his employment. (Exhibits 1 and 2 at § 3.2.)

55.     Thus, the non-compete, employee non-solicitation, and customer non-solicitation covenants in the Preceding SPCAs, to the extent the Agreement (and each later signed version) did not supersede them—which Plaintiffs deny—are similarly overbroad and unenforceable under Colorado law.

**G. Defendants Terminated Mikulka Without Cause and Mikulka Remained Unemployed for More than a Year before Accepting a Role at PFG.**

56.     On July 10, 2023, Defendants terminated Mikulka's employment without notice and effective immediately. Mikulka was terminated without cause. In fact, Defendants made it clear that Mikulka's termination was not performance based and, instead, Defendants were merely looking to go in a different direction.

57.     Mikulka remained unemployed for more than a year following his termination.

58.     Then, on October 9, 2024, PFG offered Mikulka the role of President, Regional-West at PFG. (PFG Offer Letter, attached hereto as <u>Exhibit 4</u>.)

59.     Delivering food since 1885, PFG is engaged in the distribution or sale of food products to customers throughout the United States, with customers including independent restaurants, national chain restaurants, and sports facilities. Through its various operating companies and subsidiaries, PFG has over 30,000 associates working in 150 distribution centers nationwide to service more than 300,000 customer locations.

60.     Mikulka accepted PFG's offer of employment and is scheduled to officially begin his employment with PFG on October 13, 2024. In this role, Mikulka will perform duties to ensure the growth of and assist in achieving business plan targets and sales within his designated region—which includes distribution centers and customers throughout Colorado and New Mexico.

61.    On information and belief, Defendants will seek to enforce the Restrictive Covenants in the Agreement accepted by Mikulka. Further, Plaintiffs anticipate that Mikulka's job duties and responsibilities in his role at PFG will be similar to those he had in his last position with Defendants and encompass some of the geographic region for which Mikulka was responsible in his last position with Defendants. Accordingly, Mikulka's employment with PFG will fall within the overbroad scope of the void restrictive covenants in the Agreement.

62.    Plaintiffs, therefore, will be directly and materially impacted by Defendants' enforcement or potential enforcement of the Agreement or the Preceding SPCAs, in whole or in part, and face significant and material legal uncertainty as to whether and to what extent Mikulka will be bound by the terms of the Agreement and/or the Preceding SPCAs.

## CAUSE OF ACTION

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF
### Colo. Rev. Stat. Ann. § 8-2-113(7); C.R.C.P. 57

63.    Plaintiffs incorporate the preceding paragraphs by reference.

64.    Mikulka is an employee that was a party to the Agreement which contains non-compete and non-solicitation covenants. The Agreement, last accepted by Mikulka on October 3, 2022, replaces and supersedes the Preceding SPCAs. Mikulka and PFG, as his subsequent employer, seek a declaratory judgment that the Agreement superseded the Preceding SPCAs and the non-compete and non-solicitation covenants in the Agreement are void and unenforceable. Plaintiffs seek this declaratory judgment pursuant to Colorado Revised Statutes § 8-2-113(7), as well as Colorado Rule of Civil Procedure 57.

65.    Specifically, Plaintiffs contend that the Unauthorized Use or Disclosure, Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer

23

Relationships, and Restriction on Unfair Competition sections contained in the Agreement, in Sections 2.2, 3.2, 3.3, and 3.4, respectively, are void and unenforceable under applicable Colorado law—including, without limitation, Colorado Revised Statutes § 8-2-113—because: (i) the Restrictive Covenants are broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade secrets; (ii) the Unauthorized Use or Disclosure provision is not a reasonable confidentiality provision; (iii) to the extent the Restrictive Covenants fall within the limited exceptions set forth in Colorado Revised Statutes § 8-2-113, Defendants failed to provide Mikulka the requisite notice of the non-compete and customer non-solicitation covenants; and (iv) the Restrictive Covenants are overbroad, unreasonable, and unenforceable given the expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Conflicting Product or Service," "Confidential Information," "Restricted Area," and "Business Unit." (*See* Exhibit 3.) Therefore, the Restrictive Covenants cannot and do not in any way limit or restrict Mikulka's right or ability to work for PFG in Colorado, New Mexico, or any other geographic region or PFG's right or ability to recruit or employ Mikulka in the role for which PFG is hiring him.

66.    Alternatively, to the extent this Court finds the Agreement did not supersede the Preceding SPCAs, Plaintiffs contend that the Unauthorized Use or Disclosure, Restriction on Interfering with Employee Relationships, Restriction on Interfering with Customer Relationships, and Restriction on Unfair Competition provisions contained in the Preceding SPCAs, in Sections 2.3, 3.2, 3.3, and 3.4, respectively, are unenforceable under applicable Colorado law because they are overbroad and unreasonable given the expansive language and respective use of the defined

terms "Covered Customer," Competitor," "Conflicting Product or Service," and "Confidential Information" and undefined term "confidential information." (*See* Exhibits 1 and 2.)

67.     Further, and in the alternative, this Court should find the Restrictive Covenants in the Agreement, as well as the non-competition and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), unenforceable as a matter of equity because Defendants terminated Mikulka without cause over a year ago and nonetheless seek, or will seek, to prohibit Mikulka from seeking gainful employment within the State of Colorado for the remaining nine months of his restrictive covenants.

68.     Plaintiffs respectfully request a judicial determination of the parties' rights and duties under or in relation to the Agreement, including a declaration that the Restrictive Covenants in the controlling agreement are void, unlawful, and unenforceable under Colorado law.

69.     Further, Plaintiffs seek temporary, preliminary, and/or permanent injunctive relief restraining and enjoining Defendants from enforcing or attempting to enforce any of the Restrictive Covenants. COLO. REV. STAT. ANN. § 8-2-113(8)(b) ("The attorney general and any worker or prospective worker harmed by an employer's conduct may bring an action for injunctive relief and to recover penalties."). Unless and until enjoined and restrained by order of this Court, any such enforcement or attempted enforcement by Defendants will cause harm to Plaintiffs. Plaintiffs also seek actual damages, reasonable costs, and attorney fees associated with the bringing of this action. *Id.*

70.     Alternatively, and only to the extent the Court reforms the Restrictive Covenants, or the non-compete or non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), instead of finding them wholly void and unenforceable, the Court should modify the

25

Agreement (and, to the extent applicable, the Preceding SPCAs) to limit and more clearly define the "Confidential Information" and trade secrets purportedly protected and impose reasonable limits on the scope of activity and geographical restrictions of the Restrictive Covenants, including with respect to "Covered Customers," "Competitors," "Conflicting Product or Service," and "Restricted Area."

71.    Finally, and only to the extent this Court finds that the Restrictive Covenants are enforceable despite the preceding arguments, PFG asks that this Court find Mikulka's employment with PFG is not in violation of the Agreement's (or, to the extent applicable, the Preceding SPCAs') terms because PFG will, if required by the Court, remove Denver, Colorado and New Mexico from the scope of Mikulka's area of supervision for the remainder of the two-year period under the Restrictive Covenants or the non-compete or non-solicitation covenant in the Preceding SPCAs (to the extent still controlling).

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request that the Court:

A.  Enter a judgment declaring that the Agreement accepted by Mikulka on October 3, 2022 is controlling and subject to the version of Colorado Revised Statutes § 8-2-113 effective as of August 10, 2022;

B.  Enter a judgment declaring that the preceding versions of the SPCA accepted by Mikulka were superseded by the Agreement entered on October 3, 2022;

C.  Enter a judgment declaring the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are void because they are broader than is reasonably necessary to protect Defendants' legitimate interest in protecting trade secrets (COLO. REV. STAT. ANN. § 8-2-113(2)(b), (2)(d));

D.  Enter a judgment declaring the Unauthorized Use or Disclosure provision in Section 2.2 of the Agreement is not a "reasonable confidentiality provision" to the extent it prohibits "disclosure of information that arises from the worker's general training,

26

knowledge, skill, or experience, whether gained on the job or otherwise" (COLO. REV. STAT. ANN. § 8-2-113(3)(b));

E. Enter a judgment declaring the Restriction on Interfering with Customer Relationships and the Restriction on Unfair Competition in Sections 3.3 and 3.4, respectively, of the Agreement are void because Defendants failed to provide the requisite statutory notice of such covenants (COLO. REV. STAT. ANN. § 8-2-113(4));

F. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restriction on Interfering with Employee Relationships, the Restriction on Interfering with Customer Relationships, and the Restriction on Unfair Competition in Sections 3.2, 3.3, and 3.4, respectively, of the Agreement are overbroad, unreasonable, and, thus, unenforceable given the use of expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Conflicting Product or Service," "Confidential Information," "Restricted Area," and "Business Unit," as set forth above;

G. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restriction on Interfering with Employee Relationships, the Restriction on Interfering with Customer Relationships, and the Restriction on Unfair Competition in Sections 3.2, 3.3, and 3.4, respectively, of the Preceding SPCAs are overbroad, unreasonable, and, thus, unenforceable given the use of expansive language and respective use of the defined terms "Covered Customer," "Competitor," "Confidential Information," "Conflicting Product or Service" and undefined term "confidential information," as set forth above;

H. Alternatively, and/or to the extent necessary, enter a judgment declaring the Restrictive Covenants in the Agreement, as well as the non-compete and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), are unenforceable as a matter of equity based on Defendants' termination of Mikulka without cause over a year ago;

I. Alternatively, and to the extent necessary, modify the Restrictive Covenants in the Agreement, as well as the non-compete and non-solicitation covenants in the Preceding SPCAs (to the extent still controlling), to appropriately limit such provisions in accordance with Colorado Revised Statutes § 8-2-113 and applicable Colorado case law;

J. Alternatively, and only in the event this Court finds the Restrictive Covenants in the Agreement (or, as applicable, the non-compete and non-solicitation covenants in the Preceding SPCAs) to be enforceable, enter a judgment declaring that Plaintiffs are not in violation of the non-compete covenants so long as PFG removes Denver, Colorado and New Mexico from the scope of Mikulka's geographic areas of responsibility for the remainder of the non-compete covenants' two-year term (through July 10, 2025);

K.  Enter temporary, preliminary, and permanent injunctive relief restraining and enjoining Defendants from enforcing the Restrictive Covenants in the Agreement (Colo Rev. Stat. Ann. § 8-2-113(8)(b)) or, as applicable, the non-compete and non-solicitation covenants in the Preceding SPCAs;

L.  Award Plaintiffs all actual damages, reasonable costs, and attorney fees incurred as a result of bringing this action as allowed by law, including, without limitation, Colorado Revised Statutes § 8-2-113(8)(b);

M.  Impose a penalty of $5,000 on Defendants, pursuant to Colorado Revised Statutes § 8-2-113(8)(b); and

N.  Award Plaintiffs such other and further relief the Court may deem just and proper.

Dated:  October 11, 2024                        Respectfully submitted,

                                                _/s/ Charles W. Weese_____
                                                Charles W. Weese (No. 32912)
                                                Jessica P. Marsh (No. 53473)
                                                WILLIAMS WEESE PEPPLE & FERGUSON PC

                                                Yasser A. Madriz*
                                                Meghaan C. Madriz*
                                                Miles O. Indest*
                                                Sarah Holub*
                                                MCGUIREWOODS LLP
                                                *(pro hac vice application forthcoming)

                                                ***ATTORNEYS FOR PLAINTIFFS
                                                PERFORMANCE FOOD GROUP, INC.
                                                AND WILLIAM MIKULKA***

Plaintiff's Address:

Performance Food Group, Inc.
12500 West Creek Parkway
Richmond, Virginia 23238

William Mikulka
8287 Whisper Wood Court
Parker, CO 80134

28

# EXHIBIT 1

## Sysco Protective Covenants Agreement

This Sysco Protective Covenants Agreement ("**Agreement**") is between the acknowledging Associate ("**Associate**") and Sysco Corporation, collectively referred to as the "**parties.**"

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Company or any affiliate or subsidiary of Company (collectively referred to herein as "**Company**"), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

## SECTION 1.   Benefits and Responsibilities of Employment.

   **1.1**   **Position of Trust.**   By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company.   Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company or an affiliate of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with Associates; and that Associate's use of such Confidential Information, customer and vendor goodwill, or Associate relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole.   Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

   **1.2**   **Duty of Loyalty and Conflicts of Interest.**   During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company.   Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate would otherwise have to Company through common law or statute.

PCNEA (Aug 2020)                                        1

**SECTION 2.  Confidentiality and Business Interests**.

    **2.1**    **Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement. Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

    **2.2**    **Definition of Trade Secrets.**  The term "Trade Secret" is defined herein to include information, without regard to form, including, but not limited to, technical or nontechnical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential customers or suppliers which are not commonly known by or available to the public and which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Examples of Trade Secrets include computer programs and computer code; charts, statistics, specifications, evaluations; customer lists and records; Business development guidelines, tools, strategies and methods; and management tools and problem-solving techniques.

**2.3    Unauthorized Use or Disclosure.**  Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information or Trade Secrets (as defined above), or knowingly use Confidential Information or Trade Secrets to harm or compromise the interests of Company. The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as a Trade Secret or Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information or Trade Secrets in any manner that is not within the course and scope of employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena).  If Associate believes a disclosure of Confidential Information or Trade Secrets is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure.  However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

**2.4    Associate Recordkeeping, Computer Use, and Mobile Devices.**  (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company.  Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business.  When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets. Associate agrees that the obligation to return property extends to all information and property, not just Confidential Information. (b) Associate agrees not to use Company's computers, servers, email systems, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company.  Where allowed by law,

Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

**2.5    Protected Activities.** The obligations in Section 2 are intended to maintain the confidentiality of Company's Trade Secrets and Confidential Information, to prevent the use of Company records to assist a Competitor (defined below), and to prohibit unauthorized access to and use of Company computers. Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency. Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information. "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the Trade Secret to Associate's attorney and use the Trade Secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the Trade Secret, except pursuant to court order.

**SECTION 3.    Protective Covenants.** Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's legitimate business interests, Trade Secrets, and Confidential Information. Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Trade Secrets and Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material harm. Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) necessary to protect the Company's Trade Secrets and Confidential Information, and (iii) reasonable and necessary to protect Company's legitimate business interests.

**3.1.** **Definitions Related to Protective Covenants**.

(a)    "**Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the **"Look Back Period"**): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) was learned confidential information about. A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)    "**Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period (which is presumed to be all products and services of Company during the Look Back Period due to the nature of Associate's position unless Associate can show otherwise by clear and convincing evidence). This includes, without limitation, products and services under development by Company during the Look Back Period. Some examples of conflicting products or services would be the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies during the Look Back Period to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)    "**Competitor**" means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in the same line of business as Company (a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company), including group purchasing organizations.

**3.2**    **Restriction on Interfering with Employee Relationships.** Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company. Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

**3.3**    **Restriction on Interfering with Customer Relationships.** Associate agrees that for a period of two years following the end of Associate's employment with

Company, Associate will not, in person or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy or refer persons to a Competitor or Conflicting Product or Service. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

**3.4**    **Restriction on Unfair Competition.**  Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not: accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company.  **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has regularly engaged in business activities for Company in person, by phone, or through correspondence during the Look Back Period and (ii) all states, provinces, counties, or parishes included within any geographical region or market that Associate directly or indirectly managed on behalf of Company.  Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information and customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company.  This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5**    **Clarification of Restrictions.**    In the event that the meaning of a material portion of  a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate understands that the failure to seek such a clarification

may waive Associate's right to later claim confusion over the scope or application of a restriction.

**3.6    Survival of Restrictions.**    (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Associate will not assert that Company's doing so constitutes actionable interference or defamation.    (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee.    (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction.  (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7    Geographic Scope of Restrictions for Louisiana Associates.**    To the extent Associate is assigned to an operating company located in the State of Louisiana, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.  The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8    Scope of Restrictions for Oklahoma Associates.**    To the extent Associate is assigned to an operating company located in the State of Oklahoma, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered

Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Oklahoma.

**3.9    California Associates.**  This Section 3 does not apply to Associate to the extent Associate works in the State of California.  The foregoing shall in no way limit Associate's restrictions outside the State of California.

**SECTION 4.  Special Remedies.**  If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law.   The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.  Severability, Waiver, Modification, Assignment, Governing Law.**  (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement.  (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.  (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it.  The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order.  (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s); and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate.  (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum.  (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles of any state that may be to the contrary.  (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state where Associate last regularly worked for Company.

**SECTION 6**.  **Jury Trial Waiver**.   The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.**   **Resolution for Incumbent Employee.**   This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

    **7.1.  Settlement Purpose.**   Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company.  Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions.   However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties.   Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes.   Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time or to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.

**KPDCM7JD**

**09/13/2020 09:19 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 2

**Sysco Protective Covenants Agreement**

This Sysco Protective Covenants Agreement ("**Agreement**") is between the acknowledging Associate ("**Associate**") and Sysco Corporation, collectively referred to as the "**parties.**"

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Company or any affiliate or subsidiary of Company (collectively referred to herein as "**Company**"), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

**SECTION 1.** **Benefits and Responsibilities of Employment.**

**1.1** **Position of Trust.** By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company. Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company or an affiliate of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with Associates; and that Associate's use of such Confidential Information, customer and vendor goodwill, or Associate relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole. Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

**1.2** **Duty of Loyalty and Conflicts of Interest.** During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company. Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate would otherwise have to Company through common law or statute.

**SECTION 2.  Confidentiality and Business Interests**.

      **2.1**    **Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence. Confidential Information will include trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement. Company's confidential exchange of information with a third party for business purposes will not remove it from protection under this Agreement.  Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection.

      **2.2**    **Definition of Trade Secrets.**  The term "Trade Secret" is defined herein to include information, without regard to form, including, but not limited to, technical or nontechnical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential customers or suppliers which are not commonly known by or available to the public and which information (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Examples of Trade Secrets include computer programs and computer code; charts, statistics, specifications, evaluations; customer lists and records; Business development guidelines, tools, strategies and methods; and management tools and problem-solving techniques.

PCA – US & CA (Aug 2021)                  2

**2.3**    <u>**Unauthorized Use or Disclosure.**</u>  Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information or Trade Secrets (as defined above), or knowingly use Confidential Information or Trade Secrets to harm or compromise the interests of Company.  The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as a Trade Secret or Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information or Trade Secrets in any manner that is not within the course and scope of employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena).  If Associate believes a disclosure of Confidential Information or Trade Secrets is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure.  However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

**2.4**    <u>**Associate Recordkeeping, Computer Use, and Mobile Devices.**</u>  (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company.  Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business.  When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets.  Associate agrees that the obligation to return property extends to all information and property, not just Confidential Information. (b) Associate agrees not to use Company's computers, servers, email systems, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company.  Where allowed by law,

Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

**2.5    Protected Activities.**  The obligations in Section 2 are intended to maintain the confidentiality of Company's Trade Secrets and Confidential Information, to prevent the use of Company records to assist a Competitor (defined below), and to prohibit unauthorized access to and use of Company computers. Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency.  Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information.  "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the Trade Secret to Associate's attorney and use the Trade Secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the Trade Secret, except pursuant to court order.

**SECTION 3.    Protective Covenants.**  Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's legitimate business interests, Trade Secrets, and Confidential Information.  Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Trade Secrets and Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material harm.  Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) necessary to protect the Company's Trade Secrets and Confidential Information, and (iii) reasonable and necessary to protect Company's legitimate business interests.

**3.1.** **Definitions Related to Protective Covenants.**

(a)     "**Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the **"Look Back Period"**): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) was Associate learned confidential information about.  A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)     "**Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period (which is presumed to be all products and services of Company during the Look Back Period due to the nature of Associate's position unless Associate can show otherwise by clear and convincing evidence).  This includes, without limitation, products and services under development by Company during the Look Back Period.  Some examples of conflicting products or services would be the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies during the Look Back Period to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)     "**Competitor**" means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in the same line of business as Company (a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company), including group purchasing organizations.

**3.2**     **Restriction on Interfering with Employee Relationships.**  Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company.  Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

**3.3**     **Restriction on Interfering with Customer Relationships.**  Associate agrees that for a period of two years following the end of Associate's employment with

Company, Associate will not, in person or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy or refer persons to a Competitor or Conflicting Product or Service. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

**3.4    Restriction on Unfair Competition.**  Associate agrees that for a period of two years following the end of Associate's employment with Company, Associate will not: accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has regularly engaged in business activities for Company in person, by phone, or through correspondence during the Look Back Period and (ii) all states, provinces, counties, or parishes included within any geographical region or market that Associate directly or indirectly managed on behalf of Company. Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information and customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company. This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5    Clarification of Restrictions.**    In the event that the meaning of a material portion of a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate understands that the failure to seek such a clarification

may waive Associate's right to later claim confusion over the scope or application of a restriction.

**3.6    Survival of Restrictions.**    (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Associate will not assert that Company's doing so constitutes actionable interference or defamation.    (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee. (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction. (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7    Geographic Scope of Restrictions for Louisiana Associates.**    To the extent Associate is assigned to an operating company located in the State of Louisiana, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.    The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8    Scope of Restrictions for Oklahoma Associates.**    To the extent Associate is assigned to an operating company located in the State of Oklahoma, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered

Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma. The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Oklahoma.

      **3.9**   **California Associates.** This Section 3 does not apply to Associate to the extent Associate works in the State of California. The foregoing shall in no way limit Associate's restrictions outside the State of California.

**SECTION 4.**  **Special Remedies**. If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law. The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.**  **Severability, Waiver, Modification, Assignment, Governing Law.** (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement. (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach. (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it. The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order. (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s); and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate. (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum. (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles that may be to the contrary. (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state or province where Associate last regularly worked for Company.

**SECTION 6.  Jury Trial Waiver.**   The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.   Resolution for Incumbent Employee.**   This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

 **7.1.  Settlement Purpose.**   Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company.  Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions.  However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties.  Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes.  Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time.  If Associate is working in the United States, nothing in this Agreement will be construed to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.


**LPJAUEMT**

**09/19/2021 06:21 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 3

## Sysco Protective Covenants Agreement

This Sysco Protective Covenants Agreement ("**Agreement**") is between the acknowledging Associate ("**Associate**") and Sysco Corporation, collectively referred to as the "**parties.**"

WHEREAS, Associate is or will be employed in a position of special trust and confidence with Sysco Corporation or any affiliate or subsidiary of Sysco Corporation (collectively referred to herein as "**Company**"), and as a condition of acceptance of the benefits described in Section 1.1 below, the parties seek to protect Company's Confidential Information (as defined below), inventions and discoveries, specialized training, and its customer relationships and other goodwill; the parties agree as follows:

## SECTION 1. Benefits and Responsibilities of Employment.

**1.1** **Position of Trust.** By entering into this Agreement and accepting the equity award provided by Company, Associate agrees and acknowledges that Company has granted the equity award(s) to Associate to secure Associate's commitment to advance and promote the business interests and objectives of Company. Associate further agrees and acknowledges that, in Associate's role as a key member of the executive and/or management team of Company, Associate has been entrusted with, and will continue to be entrusted with, Company's Confidential Information, goodwill of customers and vendors, and relationships with other employees of Company; and that Associate's use of such Confidential Information, customer and vendor goodwill, or employee relationships to directly or indirectly compete against Company would cause Company to suffer immediate and irreparable injury for which monetary damages would not be sufficient to make Company whole. Company agrees to provide Associate these items in exchange for and in reliance upon Associate's promise to abide by the restrictions in this Agreement.

**1.2** **Duty of Loyalty and Conflicts of Interest.** During employment, Associate will dedicate all of Associate's working time to Company and use best efforts to perform the duties assigned, remain loyal, comply with Company policies and procedures, and avoid conflicts of interest. It shall be considered a conflict of interest for Associate to knowingly assist or take steps to form or further a competing business enterprise while employed with Company, and Associate agrees to not engage in such conduct. Associate will promptly inform Company of any business opportunities related to Company's lines of business that Associate becomes aware of during employment, and any such opportunities shall be considered the intellectual property of Company whether pursued by Company or not. Nothing in this Agreement shall eliminate, reduce, or otherwise remove any legal duties or obligations that Associate otherwise owes to Company through common law or statute.

**SECTION 2.  Confidentiality and Business Interests**.

     **2.1**    **Definition of Confidential Information**. "**Confidential Information**" refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to Company's business that Company has not made public or authorized public disclosure of, and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information will not lose its protected status under this Agreement if it becomes generally known to the public or to other persons through improper means such as the unauthorized use or disclosure of the information by Associate or another person. Confidential Information includes, but is not limited to: (a) Company's business plans and analysis, customer and prospect lists, customer documents and information (including contact information, preferences, margins, order guides, and order histories) internal reports, internal business-related communications, marketing plans and strategies, research and development data, buying practices, human resources information and personnel files, financial data, operational analysis data, methods, techniques, technical or nontechnical data, know-how, innovations, computer programs or code, formulae, patterns, compilations, devices, drawings, processes, financial plans, product plans, supplier lists and records, charts, statistics, specifications, evaluations, business development guidelines, management tools and problem-solving techniques, un-patented inventions, and trade secrets; and (b) information about the business affairs of third parties (including, but not limited to, clients and acquisition targets) that such third parties provide to Company in confidence.  Confidential Information includes trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement.  Company's confidential exchange of information with a third party will not remove it from protection under this Agreement.  Associate acknowledges that items of Confidential Information are Company's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of Company, and thus, should be treated as Company's trade secrets.  Associate acknowledges and agrees that Company owns the Confidential Information. Confidential Information does not include information lawfully acquired by a non-management employee about wages, hours or other terms and conditions of non-management employees if used by them for purposes protected by Section 7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection. Confidential information also includes all such information described in this Section that relates to the business of any parent, affiliate, or subsidiary of Company.

     **2.2**    **Unauthorized Use or Disclosure.**  Associate agrees to not engage in any unauthorized use or disclosure of Confidential Information (as defined above), or knowingly use Confidential Information to harm or compromise the interests of Company. The foregoing restriction will apply throughout Associate's employment and thereafter for so long as the information at issue continues to qualify as Confidential Information as defined above. Associate understands this means Associate may not use or disclose Confidential Information in any manner that is not within the course and scope of

employment with Company and undertaken for the benefit of Company; provided, however, that nothing herein is intended to prohibit a disclosure that is compelled by law (such as by a court order or valid subpoena). Except as otherwise provided by Section 2.4 of this Agreement, if Associate believes a disclosure of Confidential Information is compelled by law, Associate will give Company as much written notice as possible under the circumstances, will refrain from use or disclosure for as long as the law allows, and will cooperate with Company to protect such information, including taking every reasonable step to protect against unnecessary disclosure. However, nothing in this Agreement, including the foregoing, prevents Associate from communicating with the EEOC, the SEC, the DOL, or any other governmental authority, making a report in good faith and with a reasonable belief of any violations of law or regulation to a governmental authority, or cooperating with or participating in a legal proceeding relating to such violations.

**2.3    Associate Recordkeeping, Computer Use, and Mobile Devices.** (a) Associate agrees to use the authorizations, Confidential Information, and other benefits of Associate's employment to further the business interests of Company. Associate agrees to preserve and not destroy records on current and prospective Company customers, suppliers, and other business relationships that Associate develops or helps to develop, and not use these records in any way, directly or indirectly, to harm Company's business. Associate shall not at any time remove, copy, download, or transmit any information from the Company, except for the benefit of the Company and in accordance with this Agreement and the Company's policies. When Associate's employment with Company terminates, or earlier if so requested, Associate will return to Company all documents, records, and materials of any kind in Associate's possession or under Associate's control, incorporating Confidential Information or otherwise, relating to Company's business, and any copies thereof (electronic or otherwise), other than documents regarding Associate's individual compensation, such as pay stubs and benefit plan booklets. Associate agrees that the obligation to return property extends to all Company information and property, not just Confidential Information. (b) Associate agrees not to use Company's computers, servers, email systems, mobile devices, or other electronic communication or storage devices for personal gain, to compete or prepare to compete, or to otherwise knowingly compromise a business interest of Company; any activity in violation of this provision shall be considered unauthorized use harmful to Company's business systems. (c) Upon request, Associate will provide for inspection any personal electronic storage devices that Company believes may contain Confidential Information, in a state that makes inspection possible, to permit Company to confirm that Associate has completely removed all Confidential Information from the devices. If Associate stores any Company information with a third-party service provider (such as Yahoo, Google Docs, DropBox or iCloud), Associate consents to the service provider's disclosure of such information to Company. Where allowed by law, Associate will execute any additional authorizations required by the service provider to disclose Company's information to Company.

**2.4    Protected Activities.** Nothing in this Section 2, or in this Agreement generally, is intended to, or shall be construed to prohibit any use or disclosure of

information that is protected by law, to prohibit a disclosure compelled by law, to prohibit lawful testimony, to interfere with law enforcement by a duly authorized law enforcement agency, or to prohibit the reporting of an illegal act to any duly authorized law enforcement agency.    Nothing herein shall be construed to prohibit a non-managerial Associate covered by the National Labor Relations Act (the "Act") from exercising Associate's rights under Section 7 of the Act, by for example, communicating with fellow Associates or union representatives about Terms and Conditions Information.    "Terms and Conditions Information" refers to information concerning the wages, hours and terms and conditions of employment, or similar matters that are the subject of a labor dispute covered by the Act.

For the sake of clarity, and not limitation, Associate's obligations relating to Confidential Information shall not preclude or prevent Associate from making disclosures that are protected by law, including, but not limited to, any disclosures relating to conduct that Associate reasonably believe to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.

In addition, Associate shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Further, in the event that Associate files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Associate may disclose the trade secret to Associate's attorney and use the trade secret in the court proceeding, if Associate: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

**SECTION 3.**   **Protective Covenants.**   Associate understands and acknowledges the scope of Associate's duties and responsibilities for the Company and agrees that this Agreement contains reasonable restrictions necessary to protect the Company's Confidential Information, trade secrets, and other legitimate business interests. Associate further acknowledges the Company is engaged in a specialized business involving highly sensitive information, and due to Associate's employment with the Company, Associate will have access to and be aware of Company Confidential Information including but not limited to significant sales activity and prospective sales activity, pricing strategies, and internal Company processes, pricing and/or customer information within the Company and other Confidential Information with respect to the Company's business and operations, which information is a valuable asset of the Company, the disclosure of which would cause the Company material and irreparable harm.  Associate agrees that the following covenants are (i) ancillary to the other enforceable agreements contained in the Agreement, (ii) supported by good and valuable consideration, including but not limited to the consideration identified in Section 1.1 of the Agreement, which Associate would not be entitled to receive unless Associate agreed to these covenants; (iii) necessary to

protect the Company's Confidential Information, and (iv) reasonable and necessary to protect Company's legitimate business interests.

### 3.1.    Definitions Related to Protective Covenants.

(a)    "**Covered Customer**" is a Company customer (person or entity) that in the two (2) year period preceding the end of Associate's employment with Company or such shorter period as the Associate may have been employed (the "**Look Back Period**"): (i) had business-related contact or dealings with Associate, (ii) was serviced or sold to by another Company associate whom Associate directly or indirectly supervised, (iii) was provided with a bid, proposal, pricing, margins, or other terms that Associate participated in determining or developing, or (iv) Associate learned Confidential Information about. A customer is understood to include a person or entity with whom Company is doing business, negotiating to do business, or actively pursuing a business relationship.

(b)    "**Conflicting Product or Service**" is a product and/or service that would displace or compete with any product or service of Company that Associate was involved in or was provided Confidential Information about during the Look Back Period.  This includes, without limitation, products and services under development by Company during the Look Back Period.  Examples of conflicting products or services include, without limitation, the negotiation of purchase agreements of, and the manufacturing, procurement, distribution and/or sale of food or related nonfood products (including, without limitation, paper products, such as disposable napkins, plates and cups, tableware, such as china and silverware, restaurant and kitchen equipment and supplies, medical and surgical supplies, cleaning supplies, and personal care guest amenities, housekeeping supplies, room accessories and hotel and motel textiles) distributed by Company and/or its affiliated operating companies to restaurants, healthcare and educational facilities, lodging establishments or other similar customers of Company.

(c)    "**Competitor**" means any person or entity, or division or subsidiary of an entity, that engages, directly or indirectly, in a line of business that involves providing a Conflicting Product or Service to customers or prospective customers of Company, including but not limited to group purchasing organizations.

### 3.2    Restriction on Interfering with Employee Relationships.    Associate agrees that during Associate's employment with Company and for a period of two years following the end of Associate's employment with Company, Associate will not knowingly: solicit, induce or encourage an employee of Company to leave Company (regardless of who first initiates the communication); help identify or evaluate Company employees for recruitment away from Company; or help any person or entity hire an employee away from Company.  Nothing herein is intended to prohibit generalized solicitation activity via public media (such as the publication of want ads) that are not targeted at Company's employees.

### 3.3    Restriction on Interfering with Customer Relationships.    Associate agrees that during Associate's employment with Company and for a period of two years

following the end of Associate's employment with Company, Associate will not, directly or indirectly, personally or through others, solicit or communicate (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: stop or reduce doing business with Company; or, to buy a Conflicting Product or Service from or otherwise refer a Covered Customer to a Competitor. The parties agree this restriction applies to prohibit Associate from switching or swapping sales, solicitation, or service responsibility for a Covered Customer with any individual who is employed by or otherwise providing services to a Competitor (including "account swapping"). The parties further agree this restriction is inherently reasonable in its geography because it is limited to the places or locations where the Covered Customer is doing business at the time. In the unlikely event that an additional geographic restriction is required by applicable law in order for this restriction to be enforceable, then this restriction shall be considered applicable to the Restricted Area (defined below).

    **3.4**   **<u>Restriction on Unfair Competition.</u>**   Associate agrees that during Associate's employment with Company and for a period of two years following the end of Associate's employment with Company, Associate will not:  accept a job or role that involves, participate in, provide, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) any activities or services for a Competitor in the Restricted Area (defined below) that are the same as, or similar in function or purpose to, those Associate performed, supervised, participated in, or learned Confidential Information about during the Look Back Period on behalf of Company. **"Restricted Area"** means the following geographic territory: (i) any state within the United States and/or any province within Canada where Associate has engaged in material business activities for Company in person, by phone or other remote means, or through correspondence during the Look Back Period; (ii) all states, provinces, counties, boroughs, or parishes included within any geographical region or market that Associate directly or indirectly serviced or managed on behalf of Company during the Look Back Period;(iii) any state, county, borough, parish or other geographic region as to which Associate had access to Confidential Information during the Look Back Period; and (iv) any state, county, borough, parish or other geographic region in which the Associate's Business Unit conducted business during the Look Back Period. "**Business Unit**" means the business segment which Company was a part of during the Look Back Period (whether U.S. and Canada Foodservice Operations, International Foodservice Operations, SYGMA, FreshPoint, Specialty Meat and Seafood, Guest Worldwide, Greco & Sons and/or the Global Support Center).   Associate acknowledges that this definition of Restricted Area is reasonable and necessary because Associate has been and will continue to be exposed to Confidential Information, and supplier and/or customer relationships within the geographic territories where Associate has engaged in business on behalf of Company and/or directly or indirectly managed on behalf of Company. This Paragraph is not intended to prohibit: (i) activities on behalf of an independently operated subsidiary, division, or unit of a diversified corporation or similar business that has common ownership with a Competitor so long as the business of the independently operated business unit does not involve a Conflicting Product or Service; or, (ii) a passive and non-controlling ownership interest in a Competitor through ownership of less than 2% of the stock in a publicly traded company.

**3.5** **Clarification of Restrictions.** In the event that the meaning of a material portion of a post-employment restriction applicable to Associate is not clear to Associate at the time Associate's employment with Company ends (such as the boundaries for applicable geographic area, scope of activity, or applicable time frame), Associate will contact a duly authorized representative of the Human Resources Department or Legal Department of Company in writing in order to get a clarification of the restriction prior to engaging in any activity that could reasonably be anticipated to fall within the restriction. Associate agrees that the failure to seek such a clarification waives Associate's right to later claim confusion over the scope or application of a restriction.

**3.6** **Survival of Restrictions.** (a) Before accepting new employment, Associate will advise the prospective future employer of the restrictions in this Agreement. Associate agrees that Company may advise a future employer or prospective employer of this Agreement and Company's position on the potential application of this Agreement to Associate and Associate agrees that Associate will not assert that Company's doing so constitutes actionable interference, defamation, or other actionable conduct. (b) The Agreement's post-employment obligations will survive the termination of Associate's employment with Company, regardless of the cause of the termination, and shall, likewise, continue to apply and be valid notwithstanding any change in Associate's duties, compensation, responsibilities, position or title and/or the assignment of this Agreement by Company to any successor in interest or other assignee. (c) If Associate violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Associate violates it, up to a maximum extension of time that equals the originally proscribed period of time, so as to give Company the full benefit of the bargained-for length of forbearance and no more. (d) If a court finds any of the Agreement's restrictions unenforceable as written, it is the intention of the parties that the Court revise or reduce the restriction (for the jurisdiction covered by that court only) so as to make it enforceable to protect Company's interests to the maximum extent legally allowed within that jurisdiction. (e) If Associate becomes employed with or provides services or assistance to a parent or affiliate entity of Company without signing a new agreement, the parent or affiliate will be considered a third party beneficiary of this Agreement and shall be entitled to the same protections and enforcement rights as Company under this Agreement.

**3.7** **Louisiana Associates.** To the extent Associate works for the Company in the State of Louisiana (or last worked for the Company in the State of Louisiana, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that the geographic scope of the restrictions included in Section 3 of this Agreement includes the following parishes: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist,

St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, and Winn.   The foregoing shall in no way limit the geographic scope of Associate's restrictions outside the State of Louisiana.

**3.8    Oklahoma Associates.**  To the extent Associate works for the Company in the State of Oklahoma (or last worked for the Company in the State of Oklahoma, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that (a) the restrictions included in Sections 3.3 of this Agreement are limited to direct solicitations of Covered Customers, (b) that the definition of a "Covered Customer" is limited to established customers of the Company, and (c) that the restrictions in Section 3.4 do not apply to Associate to the extent Associate works in the State of Oklahoma.

**3.9    California Associates.**  This Section 3 and Sections 5(e), 5(f), and 5(g) do not apply to Associate to the extent Associate works for the Company in the State of California (or last worked for the Company in the State of California, if Associate is no longer employed by the Company) at the relevant time of enforcement.

**3.10    Illinois Associates.**  To the extent Associate works for the Company in the State of Illinois (or last worked for the Company in the State of Illinois, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate acknowledges and represents that the Company has provided Associate a copy of this Agreement at least fourteen (14) calendar days prior to Associate's start of employment with the Company, or at least fourteen (14) calendar days to review the Agreement. Associate acknowledges they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily. The Company advises Associate to consult with an attorney before entering into this Agreement.

**3.11    Washington Associates.** To the extent Associate works for the Company in the State of Washington (or last worked for the Company in the State of Washington, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that notwithstanding the provisions set forth elsewhere in this Agreement:

(a)    To the extent Associate makes $107,301.04 or less per year in earnings from the Company:

(1)    the obligations and restrictions set forth in Sections 1.2, 3.2, 3.3, and 3.4 of this Agreement that apply during Associate's employment shall only apply to Associate to the extent such obligations and restrictions are commensurate and coextensive with Associate's duty of loyalty, duty to avoid conflicts of interest, and statutory duties.

(2)    that aside from: (A) the post-employment restriction prohibiting Associate from directly or indirectly soliciting any customer of the Company to cease or reduce the extent to which it is doing business with the Company, and (B) the post-employment restriction prohibiting Associate from directly or indirectly soliciting the Company's employees to terminate their relationship with the Company (collectively, the "Non-Solicitation Covenants"), which restrictions remain in full force and effect and are unaffected by this paragraph; the remainder of the post-employment restrictions set forth in Sections 3.2, 3.3, and 3.4 of this Agreement (collectively, the "Non-Competition Covenants") shall not apply to Associate.  For purposes of construing the Non-Solicitation Covenants, the term "Company" shall have the same meaning as the term "employer" in RCW 49.62.010(5) and the term "customer" shall have the same meaning as the term "customer" in RCW 49.62.010(5).

(b)    That even if Associate makes more than $107,301.04 per year in earnings from the Company, and aside from the Non-Solicitation Covenants, which are unaffected by this paragraph, the post-employment provisions of the Non-Competition Covenants shall (1) only apply for 18 months after Associate's employment with Company ends, and (2) not apply to Associate following Associate's separation from the Company if Associate is terminated by the Company as the result of a layoff, unless the Company, at its sole option, pays Associate compensation equivalent to Associate's base salary at the time of termination for the post-employment restricted period, less any compensation earned by Associate through subsequent employment during that period.

(c)    Nothing in this Agreement is intended to or shall impair any rights Associate has under Chapter 49.62. RCW.

(d)    The $107,301.04 figure referenced throughout this Section is calculated as of the earlier of the date of the Company's enforcement of any restrictive provisions or the date of Associate's separation from employment with the Company. In addition, this $107,301.04 figure is current through December 31, 2022, but is subject to annual adjustment for inflation as specified in RCW 49.62.040 (or any successor statute).

(e)    To the extent Associate was already employed by the Company at the time Associate entered into this Agreement, Associate was provided independent consideration to enter into this Agreement.

(f)    Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Section 3.4 of this Agreement.

**3.12.  Oregon Associates.**  To the extent Associate works for the Company in the State of Oregon (or last worked for the Company in the State of Oregon, if Associate is no longer employed by the Company) at the relevant time of enforcement, Associate agrees that Associate will forfeit any amount of any equity award that has not yet vested as of the first date of violation if Associate violates any of Section 3.2, 3.3, or 3.4 of this Agreement, and that, except for purposes of such forfeiture, (a) the term "Company" for

purposes of Sections 3.2 and 3.3 of this Agreement is limited to the Company-affiliated entity that employs Associate or last employed Associate, (b) the term "Covered Customer" for purposes of Section 3.3 is limited to established customers of the Company, (c) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends, and (d) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply to an Associate who (i) receives a written employment offer at least two weeks before their first day of employment which expressly states that entering into a noncompetition agreement is a condition of employment, or is a current employee who entered into this Agreement as part of a bona fide job advancement, and (ii) is either (A) exempt from overtime pay as a professional, administrative or executive employee, and earns at termination the threshold compensation required by Oregon Revised Statute 653.295(1)(e); or (B) provided (at the Company's sole and absolute discretion) compensation during the post-employment restriction period in which Associate is restricted from working at or above the level designated by Oregon Revised Statute 653.295(7).

**3.13.    Massachusetts Associates.**    To the extent Associate works for the Company in the Commonwealth of Massachusetts (or last worked for the Company in the Commonwealth of Massachusetts, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Associate agrees that the post-employment restrictions set forth in Section 3.4 of this Agreement only apply if Associate is provided (at the Company's sole and absolute discretion) compensation during the post-employment restriction period in which Associate is restricted from working at or above the level designated by Mass. Gen. Laws 24L(b)(vii), (b) the Company hereby advises Associate to consult with an attorney before entering into this Agreement, (c) the parties agree that the forum and venue for any legal action arising from this Agreement shall be in Suffolk County, Massachusetts, notwithstanding any other provision herein, (d) if Associate is entering into this Agreement in connection with commencement of employment with the Company, Associate acknowledges and represents that the Company has provided Associate a copy of this Agreement by the earlier of Associate's formal offer of employment or ten (10) business days before the commencement of Associate's employment, (e) if Associate is entering into this Agreement after commencement of employment with the Company, Associate acknowledges they have ten (10) business days to review the Agreement, and that Associate may sign the Agreement prior to the expiration of those ten (10) business days, and in so doing, Associate represents that they do so voluntarily, and (f) the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends, unless Associate has breached Associate's fiduciary duty to Company or has unlawfully taken, physically or electronically, property belonging to Company, in which case the post-employment restrictions set forth in Section 3.4 of this Agreement shall apply for 2 years after Associate's employment with Company ends.

**3.14.    Maine Associates.** To the extent Associate works for the Company in the State of Maine (or last worked for the Company in the State of Maine, if Associate is no

longer employed by the Company) at the relevant time of enforcement, (a) the post-employment restrictions set forth in Section 3.4 of this Agreement shall not apply unless Associate earns wages from the Company above 400% of the federal poverty level during Associate's employment, (b) the post-employment restrictions set forth in Section 3.4 of this Agreement do not take effect until the later of (i) one year of Associate's employment with the Company or (ii) six (6) months after the date Associate signs the Agreement, and (c) Associate has at least three (3) business days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those three (3) business days, and in so doing, Associate represents that they do so voluntarily.

**3.15.  Nevada Associates.** To the extent Associate works for the Company in the State of Nevada (or last worked for the Company in the State of Nevada, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) the post-employment restrictions set forth in Section 3.4 of this Agreement do not apply if Associate is paid by the Company solely on an hourly wage basis, exclusive of any tips or gratuities; and (b) Associate's post-employment restrictions in Sections 3.3 and 3.4 of this Agreement do not prevent Associate from providing services to a former customer or client if all of the following conditions are met: (i) Associate did not solicit the former customer or client; (ii) the customer or client voluntarily chose to leave the Company and seek services from the Associate; and (iii) Associate is otherwise complying with the limitations in the covenants in Sections 3.3 and 3.4 of this Agreement as to time, geographical area and scope of activity to be restrained, other than any limitation on providing services to a former customer or client who seeks the services of Associate without any contact instigated by Associate.

**3.16.  Virginia Associates.** To the extent Associate works for the Company in the Commonwealth of Virginia (or last worked for the Company in the Commonwealth of Virginia, if Associate is no longer employed by the Company) at the relevant time of enforcement, the post-employment restrictions set forth in Sections 3.2, 3.3, and 3.4 of this Agreement do not apply if Associate is a "low-wage employee" as defined by Virginia Code 40.1-28.7:8(A).

**3.17  Colorado Associates.** To the extent Associate works for the Company in the State of Colorado (or last worked for the Company in the State of Colorado, if Associate is no longer employed by the Company) at the relevant time of enforcement, (a) Section 3.3 only applies if Associate earns at least 60% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (b) Section 3.4 only applies if Associate earns at least 100% of the threshold amount for "highly compensated workers" as defined in Colorado H.B. 22-1317, and then only to the extent reasonably necessary to protect the Company's legitimate interest in protecting trade secrets; (c) Associate has at least fourteen (14) days to consider this Agreement before Associate is required to sign the Agreement, and Associate acknowledges that they may sign the Agreement prior to the expiration of those fourteen (14) days, and in so doing, Associate represents that they do so voluntarily; and

(d) Sections 5(e), 5(f), and 5(g) do not apply to the enforcement of Sections 3.3 or 3.4 of this Agreement.

    **3.18    Utah Associates.**  To the extent Associate works for the Company in the State of Utah (or last worked for the Company in the State of Utah, if Associate is no longer employed by the Company) at the relevant time of enforcement, the post-employment restrictions set forth in Section 3.4 of this Agreement only apply for 12 months after Associate's employment with the Company ends.

**SECTION 4.  Special Remedies**.  If Associate breaches or threatens to breach any of the restrictions or related obligations in this Agreement, Company may recover: (i) an order of specific performance or declaratory relief; (ii) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction; (iii) damages; (iv) attorney's fees and costs incurred in obtaining relief; and (v) any other legal or equitable relief or remedy allowed by law.  The parties agree that One Thousand Dollars ($1,000.00) shall be a reasonable amount of the bond to be posted if an injunction is sought by Company to enforce this Agreement and a bond is required.

**SECTION 5.  Severability, Waiver, Modification, Assignment, Governing Law.**  (a) It is the intention of the parties that if any provision of the Agreement is determined by a court of competent jurisdiction to be void, illegal or unenforceable, in whole or in part, notwithstanding the power to modify this Agreement under Section 3.6(d), all other provisions will remain in full force and effect, as if the void, illegal, or unenforceable provision is not part of the Agreement.  (b) If either party waives his, her, or its right to pursue a claim for the other's breach of any provision of the Agreement, the waiver will not extinguish that party's right to pursue a claim for a subsequent breach.  (c) Except where otherwise expressly indicated, the Agreement contains the parties' entire agreement concerning the matters covered in it.  The Agreement may not be waived, modified, altered or amended except by written agreement of all parties or by court order. (d) The Agreement will automatically inure to the benefit of Company's successors, assigns, and merged entities, as well as Company's affiliates, subsidiaries, and parent(s), each of which are third-party beneficiaries of this Agreement; and, this Agreement may be enforced by any one or more of the foregoing, without need of any further authorization or agreement from Associate.  (e) Associate consents to and agrees to the personal jurisdiction of the Courts located in Houston, Texas, over Associate, and waives Associate's right to object to the contrary, including Associate's right to plead or claim that any litigation brought in a Houston, Texas court has been brought in an inconvenient forum.  (f) The laws of the Texas will govern the Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, regardless of any conflicts of law principles that may be to the contrary.  (g) The exclusive forum and venue for any legal action arising from this Agreement that can be pursued in a court of law will be a court of competent jurisdiction in Houston, Texas, and Associate consents to the personal jurisdiction of such a court over Associate; provided, however, that if despite Associate's express consent herein it is found that no court in Houston, Texas, has personal jurisdiction over Associate, venue will be proper in the state or province where Associate last regularly worked for Company.

**SECTION 6.  Jury Trial Waiver.**   The parties hereby waive their right to jury trial on any legal dispute arising from or relating to this Agreement.

**SECTION 7.   Resolution for Incumbent Employee.**   This section applies only if Associate is already a current employee of Company at the time this Agreement is made.

     **7.1.  Settlement Purpose.**   Associate has received Confidential Information, specialized training and/or business goodwill with customers through paid employment with Company with the understanding that this was for the benefit of Company.  Due to the position of trust and confidence held by Associate some post-employment activities would by their nature deprive Company of the benefit of its Confidential Information and other investments in Associate and cause irreparable harm which justifies post-employment restrictions.   However, the nature and scope of the post-employment restrictions that are reasonable and necessary to balance the parties' interests is an unresolved matter between the parties.   Accordingly, an important purpose of this Agreement is to fully settle and resolve such uncertainties and provide a set of predictable boundaries upon which the parties may rely to avoid future disputes.   Thus, this Agreement will be enforced subject to public policies favoring settlement or resolution agreements.

Nothing in this Agreement will be construed to create a contract of employment for a definite period of time.   If Associate is working in the United States, nothing in this Agreement will be construed to prohibit either party from having the freedom to end the employment relationship at-will, with or without cause.

AGREED to and effective as of the date of Associate's electronic acknowledgment.

`MRV94EW3`

`10/03/2022 03:32 PM U.S. Eastern Standard Time`

`ACCEPTED`

# EXHIBIT 4

 Performance Food Group

October 9, 2024

Bill Mikulka
8287 Whisper Wood Court
Parker, CO 80134

Dear Bill:

It is my pleasure to offer you the position of President, Regional - West reporting to me.

I am pleased to offer you the following:

| | |
|---|---|
| Title: | President, Regional - West |
| Reporting to: | Steve Broad, EVP, PFS Field |
| Start Date: | October 13, 2024 |
| Base Salary: | The equivalent of ███ per year, or ███ per pay period, as we have twenty-six (26) pay periods. |
| Signing Bonus: | The Company will pay you a ███ signing bonus within 30 days of your start date. |
| Bonus: | Your FY25 bonus opportunity will be 100% of your base salary and will not be prorated. It will be administered based upon the guidelines in the Company's Annual Incentive Plan. Further details of the incentive plan will be provided to you under separate cover. PFG's Annual Incentive Plan will be reviewed periodically and may be subject to change at any time without notice. |
| Long Term Incentive Plan: | You will be eligible to participate in the LTIP at 40% of your base salary on the established schedule, and it will be prorated based on your time in the position. The LTIP grants are currently expected to occur annually at the Board of Directors' meeting following the end of the fiscal year. Details of the LTIP will be provided in a separate document. PFG's LTIP will be reviewed periodically and may be subject to change at any time without notice. |
| Benefits: | You will be eligible to participate in the Company's group health and wellness programs, the 401(k), our ESPP, and any other group plan offered by the Company to its associates. In addition, you will be eligible for additional benefits commensurate with your position. Please note that should you elect to participate in the Deferred Compensation Plan, you must enroll within thirty (30) days of becoming eligible.

The Company's benefit plans are subject to change, amendment, or elimination at any time at the discretion of the Company. |
| Paid Time-Off: | You will be eligible for paid time off – vacation, holidays, sick leave. The Company recognizes our dedicated senior leaders work in the best interests of our customers, associates, and the Company, and we offer you our flexible vacation program, in which paid vacation time is not limited, allocated, accrued or earned. This program gives you the flexibility to determine how much vacation time to request and use, while balancing your work responsibilities and business needs. You will also be eligible for paid holidays. The Company observes six (6) major holidays – New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day – and you will receive up to four (4) personal holidays, which are pro-rated and granted based upon hire date. In addition to paid vacation and holidays, you will also be eligible for up to 48 hours per year of paid sick time in accordance with our Colorado sick leave policy. |

**At-Will Status:**     Should you accept this offer, you will be employed "at-will," which means you or the Company may terminate your employment at any time with or without cause, and with or without notice. Should such a separation occur, all wages and other company benefits and grants not vested shall cease as of the day of separation, except as otherwise provided by applicable law or plan document. Your at-will employment status cannot be changed, except in a written document signed by you and the Chief Human Resources Officer.

**No Inconsistent Obligations:**     You hereby represent, warrant, and agree that: (i) you will not bring any confidential, proprietary, trade secret, or non-public information belonging to any other entity or person to your employment with the Company; (ii) you have not provided, and will not provide in the future, any confidential, proprietary, trade secret, or non-public information belonging to any other entity or person to the Company (except as authorized by such entity or person); (iii) you will not bring any equipment, information, documents, or other materials in any form (electronic or paper) from any prior employer to the Company, give such materials to any employee, contractor, or representative of the Company, or use such materials in your employment with the Company; and (iv) you will not use, disclose, share, disseminate, or rely upon any confidential, proprietary, trade secret, or non-public information of any prior employer, or any other entity or person (except as authorized by such entity or person), in your employment with the Company.

This offer is contingent upon your acceptance of its terms and your successful completion of the pre-employment drug test and background check.

This letter is not a contract of employment for a specific period of time, and it supersedes all written or oral communications concerning your potential employment with the Company.

If you agree with the terms and conditions set forth in this offer letter, please indicate your acceptance by signing the Acknowledgment and Acceptance Letter and returning the original to me.

Should you have any questions, please do not hesitate to contact me at (254) 774-2095.

Sincerely,

Steve Broad
EVP, PFS Field
Performance Food Group



**ACKNOWLEDGEMENT AND ACCEPTANCE
OF
OFFER LETTER FOR EMPLOYMENT**

I, Bill Mikulka, hereby acknowledge acceptance of the employment offer as outlined in the attached offer letter dated October 9, 2024, for the position of President, Regional – West and accept employment under the terms and conditions set therein.

_____        10/9/2024
Bill Mikulka                            Date